**ACE AMERICAN INSURANCE COMPANY**

v.

**ASCEND ONE CORPORATION, Amerix Corporation, Freedompoint Corporation, Freedompoint Financial Corporation, 3C Incorporated and Bernard Dancel.**

**Civil Action No. CCB–06–3371.**

United States District Court,
D. Maryland.

Aug. 7, 2008.

Alan J. Joaquin, Brian Coleman, Drinker Biddle and Reath LLP, Washington, DC, for Ace American Insurance Company.

Lawrence Paul Fletcher–Hill, Brian L. Moffet, Gordon Feinblatt Rothman Hoffberger and Hollander LLC, Baltimore, MD, Andrew M. Weiner, Dickstein Shapiro LLP, Washington, DC, for Ascend One Corporation, Amerix Corporation, Freedompoint Corporation, Freedompoint Financial Corporation, 3C Incorporated, and Bernard Dancel.

## *MEMORANDUM*

CATHERINE C. BLAKE, District Judge.

Defendant and Counter–Plaintiff Amerix Corporation ("Amerix") filed a motion

for partial summary judgment against Plaintiff and Counter–Defendant ACE American Insurance Company ("ACE") on counterclaims VII through X of its Amended Counterclaim filed on November 5, 2007. Amerix brings this motion on the grounds that under the 2006–07 Miscellaneous Errors and Omissions ("E & O") and Directors and Officers Liability ("D & O") insurance policies ACE issued to Amerix and/or affiliated entities, ACE has a duty to defend and is obligated to pay Amerix's past and future costs in responding to an Administrative Subpoena issued by the Consumer Protection Division of the Maryland Office of the Attorney General ("Subpoena") and a Civil Investigative Demand issued by the Consumer Protection Division of the Texas Office of the Attorney General ("Texas Demand"). ACE responded by filing a cross motion for summary judgment on the policy coverage issue. The issues in this case have been fully briefed and a hearing was held on June 26, 2008. Because the Subpoena and the Texas Demand 1) satisfy the Policy coverage requirements in the E & O Policy concerning civil, administrative or regulatory investigations, 2) constitute an independent claim under the '06–'07 E & O policy, and 3) were served upon Amerix during the applicable policy year, Amerix's motion for partial summary judgment will be granted and ACE's cross motion for summary judgment will be denied. The E & O policy triggers ACE's duty to defend Amerix against the Subpoena and the Texas Demand, so I need not address the D & O policy. Amerix's motion for partial summary judgment as to the counts related to the D & O policy will therefore be denied without prejudice.

### BACKGROUND

On October 23, 2006 the Consumer Protection Division of the Office of the Attorney General of Maryland served an Administrative Subpoena on Amerix pursuant to Md.Code Ann., Com. Law II § 13–405, part of the Maryland Consumer Protection Act. (Pl.'s Cross Mot. for Summ. J. 4). The Subpoena is captioned "IN RE: AMERIX CORPORATION" and "IN THE CONSUMER PROTECTION DIVISION OF THE OFFICE OF THE ATTORNEY GENERAL OF MARYLAND" and seeks documents relating to: a) Amerix's corporate structure, governance, and relationships, b) Amerix's relationships with any credit counseling agencies ("CCAs"), c) its non-profit status, d) its marketing, advertising and communications with consumers or their creditors, e) its relationship with and any payments to or from Ascend One, The Freedom Point, Freedom Point Financial and 3C Incorporated, f) information concerning the hiring and training of employees, g) comprehensive financial information relating to individual Debt Management Plans and to payments to or from CCAs, h) information relating to consumer complaints, regulatory actions or other governmental investigations, and I) its customers residing in the states of Arizona, California, Delaware, District of Columbia, Idaho, Maryland, Massachusetts, Montana, Nevada, Ohio, Oregon, Tennessee, Texas, Washington and West Virginia (Moffet Decl. Ex. 1) and three other states. (Moffet Decl. ¶ 4).

After receiving the Maryland Administrative Subpoena, Amerix retained Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC in Baltimore to handle its response. (Moffett Decl. ¶ 3). On December 29, 2006, Amerix gave ACE notice of the Maryland Administrative Subpoena via letter and requested coverage under the 06–07 E & O Policy and the 06–07 D & O Policy. (Moffett Decl. ¶ 6). In two subsequent letters dated January 24, 2007, ACE acknowledged receipt of notice of the Sub-

poena and informed Amerix that the Subpoena did not provide ACE with sufficient information to determine whether there was a "Claim" under the 06–07 D & O or 06–07 E & O policies. (Joaquin Decl. Ex. 1, 2). ACE then invited Amerix to submit additional information that may be helpful in evaluating the Claim. (Joaquin Decl. Ex. 2).

On February 12, 2007, the Texas Attorney General's Consumer Protection Division served a Civil Investigative Demand dated February 8, 2007 on Amerix pursuant to § 17.61 of the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPA"). (Pl.'s Cross Mot. for Summ. J. 5). The demand states that "[it] is relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA marketing and selling of credit counseling services," and seeks the same documents that Amerix produced to Maryland pursuant to its subpoena. (Moffet Decl. Ex. 2). Amerix notified ACE of this additional Demand by letter on September 5, 2007. (Joaquin Decl. Ex. 5).

Amerix has retained attorneys with the law firms of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC in Baltimore and Garson Claxton LLC in Bethesda to represent it in responding to both demands. (Moffet Decl. ¶ 9). In its response, Amerix has "produced hundreds of thousands of pages and tremendous quantities of electronic data to the Maryland and Texas officials . . ." and has paid more than $140,000 in fees and expenses for the matter. *Id.*

ACE subsequently denied Amerix's claim on grounds that the Subpoena and

Texas Demand do not contain a "Claim for Wrongful Acts" under the Policy and that even if they did, the Claim would be excluded under the terms of the 06–07 E & O Policy. (Pl.'s Cross Mot. for Summ. J. 2). ACE contends that the Subpoena and Demand do not describe the subject matter of any examination, investigation or hearing and that there is no documentation from either Attorney General identifying the insured as a party against whom a proceeding may be commenced. (Joaquin Decl. Ex. 8). Additionally, ACE argues that even if the investigation involved Wrongful Acts, such acts have a common nexus of facts with a 2004 class action against Amerix and its affiliates[1] and is therefore excluded under Exclusion III.L in the 06–07 E & O Policy. (Pl.'s Cross Mot. for Summ. J. 17). As a result of the denial of coverage, Amerix amended its Counterclaim in this action on November 5, 2007 in order to seek a declaration of coverage for the present claim (hereafter, the "Multi–State Claim"). (Pl.'s Cross Mot. for Summ. J. 7).

### The 06–07 E & O Policy

Under the relevant provisions of the 06–07 E & O Policy:

Section I.A provides:

The Company will pay on behalf of the Insured all sums in excess of the Retention that the Insured shall become legally obligated to pay as Damages and Claims Expenses because of a Claim first made against the Insured and reported to the Company during the Policy Period by reason of a Wrongful Act committed on or subsequent to the Retroactive Date[2] and before the end of the Policy Period[3].

---

[1]. *Laverne Jones v. Genus Credit Management Corp., et al.* (JFM–04–136).

[2]. "Retroactive Date" is specified in the Policy as June 16, 2006 under Endorsement 9. (Studley Decl. Ex. 1).

[3]. "Policy Period" is specified in the Policy as June 16, 2006 to June 16, 2007. *Id.*

Section II.C defines "Claim" to include:

4. A civil, administrative or regulatory investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document. *Id.* (emphasis in original).

However, Exclusion III.L states that:

The **Company** shall not be liable for **Damages** or **Claims Expenses** on account of any **Claim:**

L. alleging, based upon, arising out of, or attributable to:

1. any **Wrongful Act,** fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

2. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts.**

ACE's liability is additionally limited by section V.A.1, which states:

All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the Insureds shall be deemed to be one **Claim,** and such **Claim** shall be deemed to be first made on the date the earliest of such Claims is first made, regardless of whether such date is before or during the **Policy Period.** All **Damages** and all **Claims Expenses** resulting from a single **Claim** shall be deemed a single **Damage** and **Claims Expense.**

Finally, Section II provides definitions for "Professional Services," "Interrelated Wrongful Acts," and "Wrongful Acts." It states:

J. **Interrelated Wrongful Acts** means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

P. **Professional Services** means only those services specified in Item 7 of the Declarations performed for others by an **Insured** or by any other person or entity for whom the insured is legally liable.

T. **Wrongful Act** means any actual or alleged negligent act, error, omission, misstatement, misleading statement or Personal Injury Offense committed by the Insured or by any other person or entity for whom the Insured is legally liable in the performance of or failure to perform Professional Services.

(Studley Decl. Ex. 1) (emphasis in original).

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### ANALYSIS

The information contained on the face of the Maryland Administrative Subpoena and Texas Civil Investigative Demand, as well as extrinsic evidence, establish that there is a potentiality of coverage under the 06–07 E & O Policy issued by ACE, therefore triggering ACE's duty to defend. Furthermore, because the alleged Wrongful Acts underlying the Multi–State Claim are different in time and factual specifics from the Wrongful Acts at the heart of the *Jones* litigation, the claims are not Interrelated as defined by the Policy. Therefore, because the Subpoena and Texas Demand establish a potentiality of coverage and the Multi–State Claim is unrelated to the *Jones* action, Amerix is entitled to partial summary judgment on the coverage issue.

### A. Legal Background

▮ Under Maryland law, courts determine the meaning of contract language by adhering "to the principle of the objective interpretation of contracts." *ABC Imaging of Washington, Inc. v. The Travelers Indemn. Co. of America,* 150 Md.App. 390, 396, 820 A.2d 628, 632 (2003). In addition, in Maryland, "an insurance policy is a contract and is to be read as any other contract," and "words of an insurance policy are to be given their ordinary meaning." *Warfield–Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Illinois,* 66 F.Supp.2d 681, 685 (D.Md.1999) (citing *Little v. First Federated Life Ins. Co.,* 267 Md. 1, 5, 296 A.2d 372 (1972), *C & H Plumbing and Heating, Inc. v. Employers Mut. Cas. Co.,* 264 Md. 510, 511–12, 287 A.2d 238 (1972)). Specifically, "when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract." *Warfield–Dorsey,* 66 F.Supp.2d at 685 (citing *Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 779, 625 A.2d 1021 (1993)). Because the terms in this case are not ambiguous, the court does not look to extrinsic sources to interpret the terms. *See Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 305, 753 A.2d 533, 537 (2000).

▮ In Maryland, the question of whether an insurance company has a duty to defend an insured is determined by a two-part inquiry:

(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?

*St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282, 285 (1981); *see also Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.,* 457 F.3d 368, 372 (4th Cir.2006). An insurer must defend a

claim if there is a potentiality that the claim could be covered under the policy. *Chantel Assoc. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 141, 656 A.2d 779, 784 (1995) (citing *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 347 A.2d 842 (1975)). In this case, Amerix claims that the Subpoena and the Texas Demand fall within the definition of a "Claim for Wrongful Acts" under the '06–'07 E & O policy provided by ACE and thus ACE has a duty to defend Amerix in its response to the Subpoena and Texas Demand.

Under the language of the '06–'07 E & O Policy, ACE is obligated to pay claims expenses because of a "Claim first made against the insured ... by reason of a Wrongful Act...." (Studley Decl. Ex. 1). Section II.C of the policy defines "Claim" as "[a] civil, administrative or regulatory investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document." *Id.* (emphasis in original). The question at hand is whether the Maryland Administrative Subpoena and Texas Civil Investigative Demand in this case constitute an investigative order or similar document commencing a "civil, administrative or regulatory investigation," and thus establish a "Claim" by reason of a Wrongful Act under the Policy.

### B. Extrinsic Evidence

■ A threshold issue is whether an insured may present extrinsic evidence to establish a potentiality of coverage under the policy. It is well-established in Maryland that an insurer may not use extrinsic evidence to contest coverage under an insurance policy if the tort complaint establishes a potentiality of coverage. *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107, 651 A.2d 859, 863 (1995) (citing *Brohawn*, 276 Md. at 408, 347 A.2d at 850). The Maryland Court of Appeals noted that, "it is irrelevant that the insurer may get information from the insured, or from anyone else, which indicates, or even demonstrates, the injury is not in fact 'covered.'" *Id.* However, the Maryland Court of Appeals has interpreted *Brohawn* to allow an insured to present extrinsic evidence, "if that reference is necessary to determine whether there is a potentiality of coverage under an insurance policy where the tort plaintiff's complaint neither conclusively establishes or negates a potentiality of coverage." *Aetna*, 337 Md. at 108, 651 A.2d at 864. On this basis, the court has stated that the insurer's duty to defend is triggered when "an examination of the policy, the complaint and appropriate extrinsic evidence discloses a potentiality of coverage under an insurance policy." *Chantel*, 338 Md. at 141, 656 A.2d at 784.

■ ACE argues that the court should only look within the four corners of the Subpoena and Investigative Demand in determining whether there is a duty to defend. (Pl.'s Cross Mot. for Summ. J. 11). ACE relies on *Eastern Shore Financial Resources v. Donegal Mutual Ins. Co.*, 84 Md.App. 609, 622, 581 A.2d 452 (1990) in which the Maryland Court of Special Appeals held that two exhibits indicating that the acts of the insured were not intentional were properly excluded from the determination of potentiality of coverage. *See also Aetna*, 337 Md. at 106, 651 A.2d at 864. The Maryland Court of Appeals, however, has rejected this approach as "misguided," and permits insureds to submit extrinsic evidence to establish a potentiality of coverage. *Aetna*, 337 Md. at 107–08, 651 A.2d at 863–64. Therefore, extrinsic evidence provided by the insured may be considered in determining the potentiality of coverage under the policy.

### C. The Policy

Because extrinsic evidence may properly be considered in determining whether a duty to defend exists, the court looks

to the Policy, the Subpoena and Texas Demand, and appropriate extrinsic evidence to determine whether the issuance of the Subpoena and Investigative Demand constitute a filing of an investigative order or similar document commencing a "civil, administrative or regulatory investigation." Although the law is not settled as to whether any subpoena or investigative demand is considered an "investigation" for insurance purposes, subpoenas or investigative demands have been found to constitute a claim where the insured was required to produce testimony and documents pursuant to an ongoing investigation of its activities. *See Richardson Electronics, Ltd., v. Federal Ins. Co.*, 120 F.Supp.2d 698, 701 (N.D.Ill. 2000) (holding that a Civil Investigative Demand and subpoenas issued by the Antitrust Division of the Justice Department constituted a claim because it required the insured and its officers to comply with various demands for testimony and production of documents for an ongoing investigation of the company). In reaching its decision, the court in *Richardson* construed "claim" to mean a demand for something due or believed to be due, and that a "claim" in the insurance context must be a third party demand. *Id.* The court noted the demand must be actual and the fact that an insured "'reasonably conclud[ed] that a claim would inevitably be brought' would be insufficient to trigger coverage under a claims made policy." *Id.*

In contrast, courts have declined to consider custodian of records subpoenas "investigations." *See Center for Blood Research, Inc. v. Coregis Ins. Co.*, 305 F.3d 38, 39 (1st Cir.2002) (holding that a keeper of records subpoena issued and served by the United States Attorney for the District of Massachusetts does not qualify as an investigation that would trigger coverage under the insured's policy). In *Coregis*, the court noted that 1) there was no sug-

gestion in the subpoena that the government was seeking anything other than information from the Center, and 2) the subpoena itself could not have resulted in a binding adjudication of liability for damages or any other relief against the Center. *Id.* at 42. The court concluded that because there was no indication the Center was the target of any investigation, the Center should be treated only as a "custodian of records," and thus not eligible to recover under the policy. *Id.*

Similarly, in cases where the subpoena or demand for documents has come from private counsel, courts have found these claims do not rise to the level of an "investigation" for the purposes of an insurance claim. *See St. Paul Mercury Ins. Co. v. Foster*, 268 F.Supp.2d 1035, 1040 (C.D.Ill. 2003) (holding that a demand for documents from private opposing counsel was not a "claim" that would require the insured to report the request under a Directors & Officers insurance policy); *National Fire Ins. v. Bartolazo*, 27 F.3d 518, 519 (11th Cir.1994) (holding that a letter to a doctor from the attorney of a former patient requesting the patient's records in connection with a medical malpractice claim was not a "claim" that required reporting to the insurance company).

Thus, the case law suggests that Subpoenas and Investigative demands may constitute Claims where they are issued by government investigative agencies related to an investigation of the insured. Courts give weight to the seriousness of government subpoenas in considering whether they constitute an investigation. The court in *Richardson* noted that "characterizing a Justice investigation as involving a 'request' for information understates the seriousness of what such an investigation involves." 120 F.Supp.2d at 701 (citing *Polychron v. Crum & Forster Ins. Co.*, 916 F.2d 461, 463 (8th Cir.1990)). In this case,

the Subpoena and Texas Demand came from the Maryland and Texas Attorney General's Offices. Additionally, unlike *Coregis,* the Subpoena here is more than a "Keeper of Records" subpoena. Both the caption on the Subpoena ("In re: Amerix") and the specific inquiries into Amerix's marketing and credit counseling activities indicate that Amerix is a target of the investigation, not simply a source of information.

In the present case, ACE argues that 1) neither the Subpoena nor the Texas Demand were sufficient to constitute a "Claim" and 2) that neither document alleged that the Insured committed a "Wrongful Act." Even before considering extrinsic evidence, however, it is evident from the face of the Subpoena and the Texas Demand that these documents were issued pursuant to an administrative investigation of Amerix for Wrongful Acts. First, the fact that the Administrative Subpoena was issued by the Consumer Protection Division of the Office of the Attorney General of Maryland pursuant to Md.Code Ann., Com. Law II § 13–405(a), a section of the Maryland Consumer Protection Act, and is captioned "IN RE: AMERIX CORPORATION," indicates that Amerix is indeed the focus of an inquiry for violation of the Maryland Consumer Protection Act. (Moffet Decl. Ex. 1). Maryland Code Ann., Com. Law II § 13–204(1) and (2) grant the Consumer Protection Division of the Attorney General's office the power to "investigate complaints from any person affected by any potential or actual violation of this title" and to "[i]nitiate its own investigation of any unfair or deceptive trade practice." Additionally, the Texas Demand states that it was issued pursuant to § 17.61 of the Texas Deceptive Trade

Practices and Consumer Protection Act, § 17.41 *et seq.,* Tex. Bus. & Com.Code, and specifically mentions a possible violation of Section 17.46 of the Act.[4] (Moffet Dec. Ex. 2).

Furthermore, extrinsic evidence clarifies that the purpose of the Subpoena and Texas Demand is to investigate potential violations of the Maryland Consumer Protection Act. In conducting the recent deposition of Michael Croxon, President of Amerix Corporation, Phil Ziperman, Assistant Attorney General in the Maryland Consumer Protection Division, stated that "[t]his is an attorney general's investigation," (Croxon Dep. at 5:15, April 17, 2008) and that "[i]t's an investigation of the Amerix Corporation for potential violations of Maryland law, including the Consumer Protection Act." (Croxon Dep. at 6:4–6). A series of oral and written communications between counsel for Amerix and Mr. Ziperman also make clear that the Subpoena was issued because "the Office of the Attorney General is concerned that certain business practices criticized by the United States Senate in the March 2004 report ... are still being practiced by Amerix." (Joaquin Decl. Ex. 5). Therefore, it is apparent that the Maryland and Texas Attorney General's Offices have alleged violations of their respective Consumer Protection Acts and are pursuing investigations in accordance with those Acts.[5]

■ Finally, ACE argues that, "Amerix bears the burden of showing (a) that the caption 'In re Amerix Corporation' is something more than a mere identification of the Subpoena's recipient, (b) that the Subpoena was filed and (c) that it com-

---

**4.** The Texas Demand states that the Demand "is relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA in the marketing and

selling of credit counseling services." (Moffet Dec. Ex. 2).

**5.** See Md.Code. Ann. § 13–204(1) and (2); Tex. Bus. & Com.Code § 17.61.

menced an investigation against Amerix." (Pl's Reply Mem. in Supp. of Pl's Cross Mot. For Summ. J. at 4). ACE contends that, "Amerix has not established that either the Subpoena or the Texas Demand were 'filed' as required by the policy. . . ." *Id.* at 3. Nothing in the Policy, however, defines "filed" to mean that the documents must contain a case or file number. The extent and specificity of the Subpoena and Texas Demand indicate that the documents were issued to serve the function of an investigative order. This is further supported by the fact that the sole investigatory tool granted to the Maryland Attorney General's office under the Consumer Protection Act is subpoena power. Therefore, the Subpoena issued by the Consumer Protection Division of the Maryland Attorney General's Office and the related Texas Demand are, or at the very least are equivalent to, the filing of an investigative order or similar document. Accordingly, the Maryland Administrative Subpoena and the Texas Civil Investigative Demand constitute a Claim for Wrongful Acts against Amerix as defined by the 06–07 E & O Policy.

### D. Interrelated Claims Exclusion

■ ACE argues that the *Jones* claim and the Multi–State Claim are Interrelated Wrongful Acts because the overall context of the Subpoena and Texas Demand suggests that the conduct being investigated by the Maryland and Texas Attorney Generals is the same or interrelated to the conduct criticized in the Senate Report and *Jones* action. Under Maryland law, the burden rests on the insurer to establish the applicability of a particular exclusion from coverage. *Warfield–Dorsey,* 66 F.Supp.2d at 685. ACE notes that Section V.A. of the 06–07 E & O Policy provides that "all Claims arising out of the same Wrongful Act or all Interrelated Wrongful Acts of the insureds shall be deemed to be one claim. . . ." (ACE Cross Mot. for Sum-

mary Judgment at 17). Wrongful Acts are Interrelated under the Policy if they "have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." (Moffet Decl. Ex. 1). If interrelated, the current Multi–State Claim and the *Jones* claim would be a single claim "first made" during the 03–04 E & O Policy period. *See* Section V.A.1 of the 06–07 E & O Policy.

In general, courts have found claims to be interrelated when they have a common nexus of facts and arose out of the same occurrence of wrongful acts. For example, in *Zunenshine v. Executive Risk Indemnity, Inc.,* the Southern District of New York held that a claim fell under the "pending litigation" or "prior notice" exclusion of the insurance policy because the same "fact[s], circumstance[s], situation[s], transaction[s], [and] event[s]" underlay both the current and a prior claim. No. 97 Civ. 5525(MBM), 1998 WL 483475 at *5 (S.D.N.Y Aug. 17, 1998), *aff'd* 182 F.2d 902, 1999 WL 464988 (2d Cir.1999).

In *Zunenshine,* the original claim arose from a suit against SLM International ("SLM") by a class of former SLM shareholders alleging that SLM made false statements concerning 1) its net income for the first three quarters of 1993, 2) the percentage of its sales spent on television advertising, and 3) the effect of a trademark infringement action on its financial condition. *Id.* at *2. Approximately three years later, a second suit was filed by purchasers of unsecured notes from SLM claiming that the plaintiffs had distributed a memorandum concerning a proposed sale in 1993 that made false statements regarding 1) SLM's net income for the first three quarters of 1993, 2) its expenditures on television advertising, and 3) the effect of an ongoing trademark infringement action.

*Id.* Although there were differences in the parties involved in both suits and the specific wrongful acts (false statements made to noteholders versus false statements made to the general public), the court noted that the policy did not require the claims to "involve precisely the same parties, legal theories, '[w]rongful [a]ct[s],' or requests for relief." *Id.* at *5. Instead, the court focused on "whether there was a sufficient factual nexus between the two lawsuits," and found that because the same facts formed the basis for both suits, the subsequent claim was excluded from coverage. *Id.* at *4–*5. On appeal, the Second Circuit affirmed the decision of the district court and explained that "it is immaterial that the two lawsuits involved different parties and somewhat different legal harms ... because the above quoted policy terms clearly focus on the existence of common *facts.*" *Zunenshine,* 1999 WL 464988, at *2.[6]

Similarly, there are a number of other cases in which the court has found that interrelated claims exclusions apply when subsequent claims arise from common facts, events or occurrences. *See Home Ins. Co. of Ill. (N.H.) v. Spectrum Info. Techs., Inc.,* 930 F.Supp. 825, 850 (E.D.N.Y.1996) (citing *Comerica Bank v. Lexington Ins. Co.,* 3 F.3d 939 (6th Cir. 1993)) (excluding subsequent litigation from policy coverage because it involved the same agreement to sell stock as the original suit); *Ameriwood Indus. Int'l Corp. v. American Cas. Co. of Reading, Pa.,* 840 F.Supp. 1143, 1152 (W.D.Mich. 1993) (holding that one count in the complaint was excluded from coverage because it "alleged the same omissions in the same proxy literature as had the original complaint filed in the prior policy period."); *see also Bensalem Twp. v. Int'l Surplus Lines Ins. Co. Crum & Forster Managers Corp.,* Civ. A. No. 91–5315, 1992 WL 142024, at *2 (E.D.Pa. Jun. 15, 1992) (finding that the two actions were related because both involved the same underlying circumstance of the development of an industrial park and one party's attempts to interfere with the development).

**1. *The Jones Action and Senate Report***

In this case, ACE argues that the Multi-State Claim arises from the same conduct at issue in the *Jones* action. The *Jones* action, initiated on March 29, 2004 by four private citizens individually and on behalf of others similarly situated, alleges that Amerix (which provides processing and operation of telephone call centers for other Respondents and certain other DMP-selling companies (Jones Arb. Compl. ¶ 28)), and other defendants engaged in "unfair, deceptive and misleading debt management, credit counseling, budget planning and debt collection activities," related to their sale of Debt Management Plans ("DMPs") to consumers. (Jones Compl. ¶¶ 1–2). The Jones action is based on abuses outlined in a March 2004 United States Senate Report entitled *Profiting In a Non–Profit Industry: Abusive Practices in Credit Counseling* ("Senate Report"). (Jones Arb. Compl. ¶ 7). The Senate Report cited "alarming abuses" by Amerix and its credit counseling affiliates ("CCAs") and management which included:

i. Amerix's contractual imposition of "assist rates" mandating that at least 30% of all persons contacting Amerix's DMP affiliates (like Genus and AFS) be enrolled in DMPs;

ii. Amerix's requirement that each DMP originated by its DMP affili-

---

**6.** These unpublished *Zunenshine* opinions are not cited as precedential but only for their reasoning.

ates (like Genus and AFS) generate a monthly "revenue standard" of $30 per month per consumer DMP; and

iii. Amerix's for-profit control and profiteering from the business of its non-profit CCAs, like Genus and AFS. (Jones Arb. Compl. ¶ 7).

The Senate Report and *Jones* plaintiffs also allege that Amerix is a " 'back-office company' " that requires each of its affiliated "non-profit" DMP providers to pay Amerix between 50%—85% of their gross revenues. (Jones Arb. Compl. ¶¶ 43, 46–47, 79). In addition, they allege that:

i. Amerix and other Respondents advertise and solicit customers with false claims of free DMPs and free credit counseling referral services. (Jones Arb. Compl. ¶¶ 80, 87); and

ii. that "Amerix CCAs ... are not operating exclusively for exempt purposes and therefore may be in violation of tax regulations." (Jones Arb. Compl. ¶ 110).

The *Jones* plaintiffs allege violations of the Fair Debt Collection Practices Act, the Credit Repair Organizations Act, the Racketeer Influenced and Corrupt Organizations Act, the Telemarketing and Consumer Fraud and Abuse Act, the Maryland Consumer Protection Act (as well as similar statutes in other states), the Maryland Debt Management Services Act (as well as similar statutes in other states), common law breach of fiduciary duty, common law fraud and common law unjust enrichment. (Jones Arb. Compl. ¶ 8). They are seeking compensatory and punitive damages, as well as an injunction enjoining the continuation of the Respondent's alleged unlawful conduct, restitution and disgorgement. (Jones Arb. Compl. ¶ 9). Subsequently, Amerix submitted a claim under the 03–04 E & O Policy to obtain a defense from ACE in the *Jones* action.

## 2. *The Multi–State Claim*

 The Subpoena, Texas Demand, and appropriate extrinsic evidence indicate that Amerix is under investigation for allegedly continuing to engage in the type of marketing and credit counseling practices criticized in the Senate Report, which formed the basis of the *Jones* action. *See supra* Part C. ACE argues that this context "forces the conclusion that any conduct being investigated is the same or interrelated to the conduct that is criticized in the Senate Report and upon which the Jones Action is based." (Pl.'s Cross Mot. for Summ. J. 17). This approach, however, unduly broadens the scope of what constitutes Interrelated Wrongful Acts. To hold that the *Jones* claim and the Multi–State Claim are interrelated because they are both based on business practices criticized in the Senate Report would preclude coverage for *any* claim against Amerix based on how it provides business services because the Interrelated Wrongful Acts exclusion would always apply to such claims.

The appropriate approach in this case is to examine whether there is a sufficient "nexus" of facts, circumstances, events or causes between the *Jones* action and the Multi–State Claim. Unlike *Zunenshine* and the other cases cited above, where the related claim was based on the same misleading statements, the same agreement to sell stocks, and the same incidents, here the Multi–State Claim is based on occurrences different in scope and time from the alleged Wrongful Acts in the *Jones* case. The *Jones* plaintiffs are four individuals who enrolled in DMPs provided by Genus between 1998 and 1999 and a class of similarly situated individuals "who enrolled in a Debt Management Plan or similar program advertised, created or administered by any Respondent or any entity sharing common ownership of any Re-

spondent." (Jones Arb. Compl. ¶ 18, 20, 22,158). The statements of the Assistant Attorney General make clear that the Attorney General seeks information about practices Amerix has engaged in subsequent to the release of the Senate Report and the initiation of the private *Jones* litigation in 2004. Amerix's September 5, 2007 letter to ACE stated that the Maryland Attorney General is "concerned that certain business practices criticized by the United States Senate ... are still being employed by Amerix." (Joaquin Decl. Ex. 5). Thus, the Multi–State Claim and the *Jones* claim do not share a nexus of common facts.

Additionally, the two claims are distinguishable because the *Jones* action is a private suit by individuals seeking monetary damages; it arises from the specific experiences of those individuals related to their enrollment in DMPs. In contrast, the Multi–State Claim is a governmental investigation into alleged violations of various Consumer Protection statutes, under which the government can seek injunctive relief as well as civil and criminal penalties. MD.Code Ann., Com. Law II §§ 13–406, 13–410, 13–411. Furthermore, the scope of the governmental investigation is broader than the *Jones* action because it inquires into Amerix's relationships with CCAs not targeted as defendants in the *Jones* action.[7] The Subpoena itself lists four CCAs that are not parties in the *Jones* action[8]; the Assistant Attorney General questioned Amerix's President about relationships with approximately 11 different CCAs and marked as exhibits Amerix's service agreements with almost every CCA it served. (Moffet Decl. Ex. 1,

Fletcher–Hill Supp. Decl. ¶ 9). Thus, rather than investigating the specific allegations made in the *Jones* action, the government apparently is undertaking a broad investigation of Amerix's current marketing and consumer credit counseling practices.

Because the Multi–State Claim is focused on circumstances and events that occurred subsequent to the alleged Wrongful Acts underlying the Jones claim, and because the Subpoena and Texas Demand appear to be related to a broad investigation of Amerix's marketing consumer counseling business practices rather than focusing on the specific experiences of the *Jones* plaintiffs, the Multi–State Claim does not arise from the same "fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes," as the *Jones* action and is therefore not Interrelated.

For the foregoing reasons, the court finds the Multi–State Claim constitutes an independent Claim under the 06–07 E & O Policy. Amerix is therefore entitled to partial summary judgment on the issue of coverage.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. the defendant's motion for partial summary judgment (docket entry no. 49) is **GRANTED** as to coverage under the 06–07 E & O Policy and **DENIED** without

---

**7.** The defendant CCAs in the *Jones* action are Genus Credit Management Corporation f/k/a National Credit Counseling Services, and its affiliated parent companies American Financial Services, North Seattle Community College Foundation, and In Charge Institute of America, Inc. (Jones Arb. Compl. p. 1).

**8.** These CCAs are: Genesis Financial Management, Inc., Consumer Education Services, Inc., Clarion Credit Management, and Debt Management Group. (Moffet Decl. Ex. 1).

prejudice as to the 06–07 D & O Policy; and

2. the plaintiff's cross motion for summary judgment (docket entry no. 50) is **DENIED.**