Opinion filed March 5, 2025

Third Division

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| CHICAGO RESTAURANT MANAGEMENT GROUP, LLC, DAVID FLOM, and MATTHEW MOORE, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 20 L 13791 |
| GREAT AMERICAN INSURANCE COMPANY and AON RISK SERVICES CENTRAL, INC., | ) ) ) ) | |
| Defendants | ) ) | |
| (Great American Insurance Company, Defendant-Appellant, and Aon Risk Services Central, Inc., Defendant-Appellee). | ) ) ) | Honorable Catherine A. Schneider, Judge, presiding. |

---

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Reyes and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Great American Insurance Company (Great American) denied a claim for coverage filed by the insureds—plaintiffs Chicago Restaurant Management Group, LLC (Chicago Group), David Flom, and Matthew Moore—which claim was based on an underlying arbitration demand against them. Plaintiffs sued Great American, seeking a declaration that they were entitled

to coverage and alleging, *inter alia*, a claim of breach of contract. Plaintiffs also sued their insurance broker, defendant Aon Risk Services Central, Inc. (Aon), alleging claims of professional negligence and negligent misrepresentation.

¶ 2 Great American filed a counterclaim against plaintiffs, seeking a declaration that it had no duty to defend or indemnify them regarding either an earlier underlying lawsuit, for which plaintiffs never gave notice to Great American and never sought coverage, or the arbitration demand that was the basis of plaintiffs' coverage claim.

¶ 3 Great American moved for summary judgment, and plaintiffs filed a cross-motion for partial summary judgment. Relevant to this appeal, the circuit court granted summary judgment in favor of plaintiffs and against Great American on plaintiffs' declaratory relief and breach of contract claims. The court also granted summary judgment in favor of plaintiffs and against Great American on Great American's counterclaim regarding the arbitration demand.

¶ 4 On appeal, Great American argues that it is entitled to summary judgment because plaintiffs' claim based on the arbitration demand is a "Related Wrongful Act" under the terms of the policy and shares a "common nexus" or "causal connection" with the earlier underlying lawsuit, of which plaintiffs never gave Great American timely notice.

¶ 5 For the reasons that follow, we affirm the judgment of the circuit court.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal had been resolved without oral argument upon the entry of a separate written order.

¶ 6                                    I. BACKGROUND

¶ 7     Plaintiffs Flom and Moore were owners of Chicago Cut Steakhouse, LLC (Chicago Cut) and members of plaintiff Chicago Group, which develops and manages restaurants. This case arises from plaintiffs' attempt to gain insurance coverage, based on an underlying 2019 arbitration demand against them, under a policy issued by defendant Great American. Defendant Aon was plaintiffs' insurance broker at all relevant times.

¶ 8     Great American issued two separate but substantively identical policies to Chicago Group for two successive policy periods. Specifically, in July 2017, Great American issued a "claims made" management liability solutions insurance policy to Chicago Group effective for the period July 14, 2017, to July 14, 2018 (2017-2018 policy). In July 2018, Great American issued another management liability solutions insurance policy to Chicago Group, effective for the period July 14, 2018, to July 14, 2019, renewing the 2017-2018 policy terms (2018-2019 policy).

¶ 9     In April 2018, during the 2017-2018 policy period, four Chicago Cut investors (Michael Forde, Mark Defife, John Koutoupis, and Frank Phillips), acting individually and derivatively on behalf of Chicago Cut, filed a lawsuit against plaintiffs in the Cook County Chancery Division, seeking declaratory relief for access to Chicago Cut's corporate books and records (the 2018 lawsuit). The 2018 lawsuit described the nature of action as "an action by members of [Chicago Cut] to enforce their basic and undisputed statutory right to inspect the books and records of [Chicago Cut] in which they invested and are members." The investors explained that the 2018 lawsuit was based on their "desire to know the true financial situation of the restaurant and [limited liability company]."

¶ 10    The investors based their demand for corporate records on (1) a private placement memorandum prepared by plaintiffs, (2) Chicago Cut's operating agreement, and (3) the Limited Liability Company Act (805 ILCS 180/1-1 *et seq.* (West 2016)). The 2018 lawsuit set forth two causes of action seeking only injunctive relief. In count I, the investors sought an injunction requiring that Chicago Cut's records be produced and alleged that plaintiffs failed "to produce these materials *** in violation of their statutory duties." In count II, the investors brought a derivative claim seeking an injunction preventing Chicago Cut from paying plaintiffs' attorney fees in defending the 2018 lawsuit and alleging that plaintiffs' failure to provide corporate records was a "violation of their fiduciary and statutory duties." The 2018 lawsuit relied on plaintiffs' alleged practice of providing "very little information about [Chicago Cut's] finances." Plaintiffs did not submit a claim to Great American seeking coverage for the 2018 lawsuit during the 2017-2018 policy period. Ultimately, plaintiffs produced the books and records that were the subject of the 2018 lawsuit, so the injunctive relief sought in that lawsuit was not pursued thereafter.

¶ 11    In February 2019, five Chicago Cut investors (John Koutoupis, Noel "Skip" Dunn, Brendan Gilligan, Mark Defife, and Frank Phillips) individually, derivatively, and as class action representatives, filed a private arbitration demand against plaintiffs, alleging various tort and breach of contract claims. The arbitration demand sought over $8 million in damages from plaintiffs, alleging they had misappropriated at least that amount of Chicago Cut's corporate funds. The arbitration demand described the nature of action as:

> "[A] derivative action *** to end [plaintiffs'] ongoing breaches of their fiduciary, contractual and statutory duties, terminate [Chicago Group's management of Chicago Cut],

terminate the [Chicago Cut] membership interests of Flom and Moore, recoup millions of dollars that [plaintiffs] have misappropriated from [Chicago Cut], and prevent [plaintiffs'] ongoing efforts to pilfer millions of dollars per year from [Chicago Cut]."

¶ 12     As background, the arbitration demand restated, verbatim, certain of the 2018 lawsuit allegations concerning plaintiffs' failure to produce records pursuant to the Chicago Cut private placement memorandum and operating agreement. However, plaintiffs' failure to produce those corporate records bore no relationship to any of the relief sought in the arbitration demand. The arbitration demand rested upon plaintiffs' alleged conduct with respect to Chicago Cut's assets and alleged (1) improper loans from Chicago Cut to Flom and Moore totaling over $1 million, (2) improper licensing fees charged by Chicago Group to Chicago Cut for use of the Chicago Cut name totaling over $3 million, (3) improper ("double-dipping") salary payments over the management fee paid by Chicago Cut to Chicago Group totaling over $3 million, (4) improper and "exorbitant" personal expense reimbursements, and (5) improper loans by Chicago Cut to another restaurant. The investors alleged that these various forms of misappropriation stemmed back to at least 2015, approximately three years before the 2018 lawsuit.

¶ 13     The arbitration demand set forth seven derivative and class causes of action seeking termination of plaintiffs' management agreement, expulsion of plaintiffs as members of Chicago Cut, appointment of a receiver, an accounting, and compensatory and punitive damages. The arbitration demand did not include any cause of action seeking access to books and records, nor did it otherwise request any relief relating to Chicago Cut's books and records. Ultimately, plaintiffs entered into a confidential settlement agreement to resolve the arbitration demand, which

included monetary payments by plaintiffs to Chicago Cut. Plaintiffs also incurred substantial attorney fees and costs in defending the arbitration. The settlement agreement recognized that there was no admission by plaintiffs of the wrongdoing alleged in the arbitration demand.

¶ 14 In March 2019, Aon provided, on behalf of plaintiffs, notice to Great American of the arbitration demand during the 2018-2019 policy period. In May 2019, Great American denied plaintiffs' claim for coverage of losses from the arbitration demand on the basis that their notice of the claim was untimely. According to Great American, the 2018 lawsuit's declaratory relief claims and the arbitration demand's tort and breach of contract claims constituted "Related Wrongful Acts" under the insurance policy's terms. Thus, Great American asserted that the 2018 lawsuit and the arbitration demand were a "Single Claim," requiring that plaintiffs provide notice during the preceding policy period. Great American also denied the claim because plaintiffs' losses from the arbitration demand stemmed from their misappropriation of funds and thus were not covered under the insurance policy.

¶ 15 As a result of Great American's denial, plaintiffs sued Great American in the case at issue here, seeking a declaration that they were entitled to coverage for the monetary payments and losses identified in the settlement of the arbitration demand. Plaintiff also alleged, *inter alia*, a claim of breach of contract against Great American. Furthermore, plaintiffs sued Aon, alleging claims of professional negligence and negligent misrepresentation.

¶ 16 Great American moved for summary judgment, requesting, in pertinent part, that the court find that the 2018 lawsuit and the arbitration demand were a "Single Claim" under the "Related Wrongful Acts" provision of the insurance policy, thereby precluding coverage for the arbitration

demand under the 2018-2019 policy. Plaintiffs filed a cross-motion for partial summary judgment, opposing Great American's arguments on the "Related Wrongful Acts" issue. Aon filed a response in opposition to Great American's summary judgment motion, arguing that Great American's determination on the "Related Wrongful Acts" issue was incorrect as a matter of law.[2]

¶ 17    In September 2023, the circuit court issued an order rejecting Great American's position and agreeing with plaintiffs and Aon. The circuit court found that the 2018 lawsuit and the arbitration demand were not "Related Wrongful Acts" because they "[did] not share a common nexus nor [were] they causally connected." It reasoned that the 2018 lawsuit "involve[d] the books and record request from certain Chicago Cut investors," while the arbitration demand separately brought "claims that [were] unrelated to Chicago Cut turning over the books and records." The circuit court further explained that, while the arbitration demand "reference[d] the [2018] lawsuit," it did so "only so far as it provide[d] background for the arbitration demand." Finally, the circuit court held that the 2018 lawsuit was "not causally connected to the arbitration demand" because "even if the [2018] lawsuit had not occurred because the books and records were turned over, the arbitration demand would have still been filed." Later, the circuit entered an agreed order finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no just reason for delaying appeal of the September 2023 order.

¶ 18    Great American timely appealed.

---

[2]Aon, however, agrees with Great American that the 2018-2019 policy ultimately does not provide coverage to plaintiffs for the arbitration demand because their losses from that proceeding resulted from the misappropriation of Chicago Cut's funds and, thus, those losses are uninsurable pursuant to the 2018-2019 policy's terms and as a matter of law. The circuit court has not ruled on that issue and it is not part of this appeal.

¶ 19                                    II. ANALYSIS

¶ 20    Great American moves this court to strike Aon's appellee brief or, alternatively, to allow additional pages for Great American's reply brief. Great American states that the September 2023 order on appeal addressed only plaintiffs' counts against Great American and the two counts of Great American's counterclaim against plaintiffs. Without citation to any relevant authority, Great American argues that this court should strike Aon's appellee brief because Aon has designated itself as a defendant-appellee but did not seek leave to file a response brief on appeal from the September 2023 order that did not address any count or cause of action by or against Aon.

¶ 21    We deny Great American's motion. It is well established that

> " '[r]eviewing courts are entitled to have the issues clearly defined, to be cited pertinent authorities and are not a depository in which an appellant is to dump *** argument and research as it were, upon the court' [citation] and failure to cite to authority may result in forfeiture of the issue on appeal. [Citation.]" *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 20.

Furthermore, Aon is a party to this case, and Illinois Supreme Court Rule 341(i) (eff. Oct. 1, 2020) contemplates the filing of briefs by "the appellee and other parties." In addition, the sole issue raised in this appeal—*i.e.*, whether the "Related Wrongful Acts" provision of the policy applies to plaintiffs' insurance claim to Great American—fundamentally impacts Aon's potential liability. Finally, Aon, which had filed a response to Great American's summary judgment motion before the circuit court, does not inject any new or improper arguments into this appeal.

¶ 22 A trial court's ruling on a motion for summary judgment is reviewed *de novo* on appeal. *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 20. Questions of law relating to the construction of language in an insurance policy are also reviewed *de novo. Id.*; *Sproull v. State Farm Fire & Casualty Co.*, 2021 IL 126446, ¶ 19. Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Acuity*, 2023 IL 129087, ¶ 20.

¶ 23 Great American argues that the circuit court erred when it found that the 2018 lawsuit and the arbitration demand are not "Related Wrongful Acts." Great American argues that the two actions share a "common nexus" or "causal connection" because they arise from alleged breaches of plaintiffs' fiduciary duties, they allege overlapping or similar claims, and the Chicago Cut investors filed the arbitration demand after receiving the books and records sought in the 2018 lawsuit.

¶ 24 Only the 2018-2019 policy is relevant to the issue on appeal here. With respect to the directors' and officers' (D & O) coverage at issue here, section II.A of the 2018-2019 policy defined a "Claim," in pertinent part, as:

> "(1) a written demand, other than a Shareholder Derivative Demand, for monetary or [nonmonetary] relief;

> (2) a civil proceeding commenced by the service of a complaint or similar pleading;

*  *  *

(5) an arbitration *** proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding with the Insurer's written consent;"

The policy's general terms and conditions also contained a definition in section II.O addressing when multiple claims were to be treated as a "Single Claim" for the purpose of reporting a "Claim" to Great American:

"O. Single Claim shall mean all Claim(s) involving the same Wrongful Act or Related Wrongful Acts"

Section II.N of the D & O coverage provisions of the policy defined "Wrongful Act(s)" as:

"N. Wrongful Act(s) shall mean:

(1) any actual or alleged act, omission, error, misstatement, misleading statement, neglect, breach of duty by any Insured Persons in their capacity as such *** or any matter claimed against any Insured Persons by reason of their status as Insured Persons;

(2) with respect only to Insuring Agreement I.C., any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty by the Company;"

Finally, the policy's general terms and conditions in section II.N defined "Related Wrongful Acts" as:

"N. Related Wrongful Acts shall mean all Wrongful Acts that have as a *common nexus*, or are *causally connected* by reason of any fact, circumstance, situation, event or decision." (Emphases added.)

¶ 25    Based on these definitions, the policy's general conditions in section VIII.A.(3) set forth the following provision for calculating the "claims made" date where a "Single Claim" was involved.

"(3) All Claims constituting a Single Claim shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such Claim was first made; or (2) the earliest date on which any such Wrongful Act or Related Wrongful Act was reported under this Policy or any other policy providing similar coverage."

¶ 26    The unambiguous, plain language of the definition of the "Related Wrongful Acts" provision supports the circuit court's ruling that the 2018 lawsuit and the arbitration demand do not fall within that definition because they do not share any "common nexus." The 2018 lawsuit sought an injunction for plaintiffs' failure to produce corporate records whereas the arbitration demand sought millions of dollars in damages for plaintiffs' alleged misappropriation of corporate funds. Nor are the two actions "causally connected." Plaintiffs' alleged failure to produce corporate records did not cause plaintiffs' misappropriation of funds.

¶ 27    The policy defines "Related Wrongful Acts" as those that have "a common nexus or are causally connected by means of any fact, circumstance, situation, event or decision." Courts construe unambiguous terms by their plain and ordinary meaning. *The Hanover Insurance Co. v. MRC Polymers, Inc.*, 2020 IL App (1st) 192337, ¶ 38. The term "nexus" means a connection or

link, also a causal link. See Merriam-Webster's Collegiate Dictionary 836 (11th ed. 2020); Black's Law Dictionary 1066 (7th ed. 1999). The term "causal" means of, relating to, or constituting a cause; involving causation or a cause; and arising from a cause. See Merriam-Webster's Collegiate Dictionary 196 (11th ed. 2020); Black's Law Dictionary 212 (7th ed. 1999). "Causation" means "the act or process of causing," "the act or agency which produces an effect." Merriam-Webster's Collegiate Dictionary 196 (11th ed. 2020); see Black's Law Dictionary 212 (7th ed. 1999) ("[t]he causing or producing of an effect").

¶ 28    The 2018 lawsuit and the arbitration demand neither share a "common nexus" nor are they "causally connected" per the plain meaning of those terms. First, there is no "nexus" between the 2018 lawsuit and the arbitration demand. The 2018 lawsuit is premised on plaintiffs' breach of a specific contractual and statutory obligation to provide access to corporate documents. The arbitration demand is premised on an entirely different breach of the duty to refrain from self-dealing in corporate assets. These obligations, duties, and breaches are separate and distinct; there is no connection or link between the separate breaches, nor is plaintiffs' breach relating to self-dealing part of any "connected group or series" involving the earlier breach of plaintiffs' contractual and statutory obligation to provide corporate records.

¶ 29    Furthermore, plaintiffs' failure to share corporate records is not "causally connected" to their alleged misappropriation of funds. There is no allegation in the 2018 lawsuit or the arbitration demand suggesting plaintiffs' breach of their contractual and statutory obligation to provide Chicago Cut's investors with access to books and records caused their misappropriation of funds. There is no evidence that the Chicago Cut investors would have refrained from filing the arbitration

demand if plaintiffs had not breached their contractual and statutory obligation to provide books and records. The opposite is true; if plaintiffs had immediately turned over the requested books and records, that compliance would not have stopped the investors from filing the arbitration demand for misappropriation of corporate funds. The 2018 lawsuit and the events underlying it had no causal effect on the arbitration demand.

¶ 30     A comparison of the 2018 lawsuit and the arbitration demand confirms that they share no common nexus and are not causally connected. The 2018 lawsuit sought to enforce the investors' "statutory right" to inspect corporate records, and the investors' same right under Chicago Cut's operating agreement. Unlike the arbitration demand, the 2018 lawsuit did not allege misappropriations, improper loans, inappropriate licensing fees, double-dipping salary payments, or exorbitant personal expenses. The arbitration demand brought various tort and breach of contract claims against plaintiffs, due to their "efforts to pilfer millions of dollars per year" from Chicago Cut. The arbitration demand does not connect plaintiffs' efforts to "pilfer" the corporate coffers with plaintiffs' failure to fulfill their contractual and statutory obligation to provide investor access to corporate records.

¶ 31     Great American emphasizes that the investors repeated some allegations from the 2018 lawsuit in the arbitration demand when describing the history of the parties' relationship. As the circuit court correctly observed, the arbitration demand did so "only so far as it provide[d] background for the arbitration demand." That the arbitration demand repeats these allegations does not render the causes of action, breaches of duty, relevant underlying facts, or relief sought in the two actions the same (or even similar). We recognize that separate lawsuits need not involve

precisely the same parties, legal theories, wrongful acts, and requests for relief to constitute "Related Wrongful Acts." See *Cushman & Wakefield, Inc. v. Illinois National Insurance Co.*, No. 14 C 8725, 2018 WL 1898339, at *17 (N.D. Ill. Apr. 20, 2018). Nevertheless, we conclude that the circuit court here ruled correctly because the two actions contained entirely different causes of action, legal theories and requested relief.

¶ 32    Great American cites an unpublished order filed under Illinois Supreme Court Rule 23 (eff. Feb. 1, 2023), *Steadfast Insurance Co. v. State Parkway Condominium Ass'n*, 2023 IL App (1st) 220888-U, to support its argument that the circuit court erred in finding that the "Related Wrongful Acts" provision does not apply here. However, the various claims underlying the insurance coverage litigation in *Steadfast* are distinguishable from the facts of this case. Critically, the *Steadfast* court found that those claims constituted "Related Wrongful Acts" because they "all repeated similar allegations of Wrongful Acts," consisting of alleged "numerous incidents of retaliatory, harassing, and discriminatory conduct" against Novak, the condominium owner involved in multiple actions against State Parkway Condominium Association (the Association). *Id.* ¶ 75. While one of the many claims Novak brought against the Association did involve an alleged breach of duty for failing to respond to a books and records request, the *Steadfast* court did not mention that claim once in explaining why the string of underlying litigation constituted "Related Wrongful Acts."[3] See *id.* ¶¶ 7, 75, 79. Rather, the court found that the claims in Novak's lawsuits "all arose out of [the Association's] alleged continuous harassing and discriminatory

---

[3]Great American implies that the *Steadfast* court focused on the books and records-related claim in its holding. However, the portions of *Steadfast* that Great American cites—and the only portions of the opinion referencing that claim whatsoever—are from the court's background description of Novak's various lawsuits. *Steadfast*, 2023 IL App (1st) 220888-U, ¶¶ 6-7.

conduct and retaliation for" the initial lawsuit Novak had filed in 2007, which alleged the Association failed to make reasonable accommodations for his disability. *Id.* ¶¶ 5, 75.

¶ 33    A closer examination of the various claims brought by Novak in *Steadfast* shows why the reasoning of that order's holding does not apply to the facts here.

(1) In January 2007, Novak filed his first claim against the Association with the Illinois Department of Human Rights ("IDHR"), alleging the Association "failed to make reasonable accommodations for his hearing impairment at a January 2006 [condominium association] board meeting" *Id.* ¶ 5.

(2) In March 2008, the Association filed a lawsuit against Novak, alleging violations of Association rules and regulations and harassment by Novak. *Id.* ¶ 6.

(3) In January 2009, Novak filed a counterclaim in that same lawsuit, alleging "discriminatory and harassing conduct by [the Association]" and individuals and entities affiliated with the Association. *Id.* Novak alleged that this discriminatory and harassing conduct was in retaliation for his attempts to obtain books and records, attempts to bring to light accounting discrepancies, and due to his disability. *Id.*

(4) Novak later amended his counterclaims twice. In his second amended counterclaim, Novak "added additional allegations of conduct through July 2009 that had occurred" since his first counterclaim. *Id.* ¶ 7. In total, Novak's claims involved allegations that the Association targeted him with additional rules, fees, and penalties; failed to comply with books and records inspection laws; failed to respond to requests for documents; and

discriminated against him by failing to make various accommodations for his disability. *Id.*

(5) In November 2010, Novak filed another housing discrimination complaint against the Association with the IDHR, alleging, *inter alia*, that the Association had engaged in numerous forms of disability discrimination. *Id.* ¶ 8.

(6) In November 2013, Novak filed a federal lawsuit against the Association and other related individuals and entities, alleging violations of fair housing laws and negligent infliction of emotional distress. *Id.* ¶ 9.

The "common nexus" and "causal connection" between these lawsuits is the core allegation that the Association engaged in a pattern of similar illegal conduct against Novak. Specifically, and as the *Steadfast* court emphasized as the central aspect of its opinion, all the above-listed claims "arose out of [the Association's] alleged continuous harassing and discriminatory conduct and retaliation for Novak's 2007 IDHR Claim." *Id.* ¶ 75. To the extent the books and records aspect of Novak's various complaints fell under the "Related Wrongful Acts" in *Steadfast*, it did so only because the Association allegedly retaliated against him in part because of his efforts to obtain documents. See *id.*

¶ 34    The *Steadfast* order supported its holding by citing to other Illinois cases finding "Related Wrongful Acts" based on the same string of similar, repeated bad acts. *Id.* ¶¶ 77-78. For example, the court cited *Continental Casualty Co. v. Howard Hoffman & Associates*, 2011 IL App (1st) 100957, ¶¶ 67-68 (describing multiple acts of embezzlement by a law firm employee); *Twin City Fire Insurance Co. v. Permatron Corp.*, No. 15 C 10252, 2018 WL 1565599, at *5 (N.D. Ill. Mar.

30, 2018) (finding separate claims all stemmed from an employee's firing); and *Cushman & Wakefield, Inc.*, 2018 WL 1898339, at *5, 18-19 (claims bore sufficient factual nexus because they involved overlapping properties and a common scheme).

¶ 35    In contrast to *Steadfast* and all the authorities cited therein, here the arbitration demand did not allege any string of related, wrongful conduct stemming back to the 2018 lawsuit and underlying the investors' claims. The arbitration demand did not arise out of any conduct or pattern of conduct by plaintiffs relating to the 2018 lawsuit. The Chicago Cut investors did not allege that they filed the arbitration demand because of plaintiffs' breach of their contractual and statutory obligation to provide access to corporate books and records. Nor did the investors allege that plaintiffs misappropriated corporate funds because of the 2018 lawsuit or as an aftereffect of it— unlike Novak's allegations of the Association's discrimination and retaliation for his earlier lawsuit. We conclude that *Steadfast* is not persuasive authority in the instant case because the facts are different.

¶ 36    We find support for our conclusion that the 2018 lawsuit and the arbitration demand do not share a common nexus or causal connection in two Illinois cases that made findings of "Related Wrongful Acts" only where the underlying facts established the kind of pattern of conduct absent in this case.

¶ 37    First, in *Freeburg Community Consolidated School District No. 70 v. Country Mutual Insurance Co.*, 2021 IL App (5th) 190098, the court examined whether a federal sexual abuse lawsuit (known as "Doe 4") against the Freeburg, Illinois School District was covered pursuant to

a "claims made" policy issued by RSUI Indemnity Company for the period 2013-2014. The RSUI policy included a limitation of liability provision defining a "single Claim" as

"[a]ll *Claims* based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transaction or events, or the same or related series of facts, circumstances, situations, transactions or events shall be deemed to be a single *Claim* for all purposes under this policy, *** and shall be deemed first made when the earliest of such *Claims* is first made, regardless of whether such date is before or during the *Policy Period*." (Emphases in original and internal quotation marks omitted.) *Id.* ¶ 21.

A "prior acts" exclusion in the RSUI policy precluded coverage for any claim:

"[a]lleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any Insured that was commenced or initiated prior to or was pending at the inception date of this policy, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation." (Internal quotation marks omitted.) *Id.* ¶ 19.

¶ 38     The court held that three federal sexual abuse lawsuits filed before 2013 and Doe 4 were a single claim first made prior to the RSUI policy period because they "directly *** resulted from *** the same or related series of facts circumstances, situations, transactions or events." (Internal quotation marks omitted.) *Id.* ¶ 100. The court determined that the pre-2013 sexual abuse cases and Doe 4 alleged the same wrongdoing and the same harm and sought the same monetary damages. *Id.* ¶¶ 101-02. It also noted that "the overriding common event among the *** actions is

the causal connection of the alleged misconduct of Freeburg school district officials *** in failing to take action to protect students from a reported sexual predator employed by Freeburg school district." *Id.* ¶ 101.

¶ 39 *Freeburg*'s holding counsels against Great American's position here. Unlike the sexual abuse lawsuits in *Freeburg*, the 2018 lawsuit and the arbitration demand (1) were not premised on an "overriding common event," (2) did not allege the same wrongdoing or harm, and (3) did not seek the same relief. The 2018 lawsuit was based on a breach of plaintiff's contractual and statutory obligation for failure to provide corporate records and sought an injunction requiring production of those records. The arbitration demand, on the other hand (1) was brought on a derivative and class action basis, (2) was based on an alleged breach of duty arising from self-dealing, (3) sought wide-ranging injunctive relief related not to Chicago Cut's corporate records but, rather, to the termination of Moore and Flom as managers of Chicago Cut, and (4) demanded compensatory and punitive damages exceeding $8 million.

¶ 40 Similarly, in the federal case *Permatron Corp.*, 2018 WL 1565599, at *2, the Northern District of Illinois considered a "common nexus" and "causally connected" definition in consecutive, "claims made" policies issued by Twin City Fire Insurance (Twin City) for the 2014-2015 and 2015-2016 periods. The policies defined "Interrelated Wrongful Acts" as "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies, or causes." (Internal quotation marks omitted.) *Id.*

¶ 41    During the first policy period, Permatron terminated an employee who subsequently filed initial and amended discrimination actions with the Equal Employment Opportunity Commission (EEOC) and the IDHR. *Id.* at *1. Permatron did not submit a claim to Twin City during the first policy period. *Id.* at *1, *4. During the second policy period, the same employee filed a direct lawsuit for discrimination, a second lawsuit for retaliatory discharge, and a third action with the EEOC and IDHR. *Id.* at *1-2, *4. Permatron submitted a claim to Twin City for the lawsuit and actions filed during the second policy period. *Id.* at *4. Twin City denied coverage on the grounds that the claims filed in the second policy period were "interrelated" with the initial EEOC and IDHR matters and, therefore, the claim was untimely. *Id.* at *1-2, *4.

¶ 42    Twin City filed a declaratory judgment action and moved for summary judgment, arguing the matters were "interrelated." *Id.* at *3. The district court granted Twin City's motion and held that the employee's actions "[arose] from a single event: the termination of [the employee's] employment with Permatron in August 2014." *Id.* at *5. While the district court noted the definition of "Interrelated Wrongful Acts" was "quite broad," it based its decision on a conclusion that the actions "have a common nexus in that they all arise from" the employee's termination. *Id.* at *6.

¶ 43    The district court's analysis of the "common nexus" and "causally connected" definitions supports the circuit court's ruling here. The 2018 lawsuit and the arbitration demand did not arise from a "single event." The 2018 lawsuit arose from plaintiffs' failure to provide corporate records, while the arbitration demand arose from a breach of duty for misappropriation of corporate assets.

¶ 44 Other jurisdictions have considered the definitions of "common nexus" and "causally connected" in similar insurance policies and issued opinions contradicting Great American's position.

¶ 45 In *Pfizer Inc. v. Arch Insurance Co.*, No. N18C-01- 310, 2019 WL 3306043, at *10 (Del. Super. Ct. July 23, 2019), the Delaware Superior Court applied Delaware law to conclude that two securities class actions were not "Interrelated Wrongful Acts." The events underlying *Pfizer* began in 2003, when a securities class action known as the "Garber Action" was filed against Pharmacia (a Pfizer subsidiary), alleging false representations about the gastrointestinal side-effects of Pfizer's medication Celebrex. *Id.* at *3.

¶ 46 In April 2004, Arch Insurance Company ("Arch") issued an excess D & O liability policy to Pfizer. *Id.* at *2. The Arch policy contained an exclusion that precluded coverage for any "Interrelated Wrongful Acts" alleged in, or arising from, the "Garber Action." *Id.* at *5. The Arch policy defined "Interrelated Wrongful Acts" as "a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." *Id.*

¶ 47 Later in 2004, a second securities class action known as the "Morabito Action" was filed against Pfizer, alleging that it made false representations concerning the cardiovascular side-effects of Celebrex—the same drug at the center of the "Garber Action." *Id.* at *3. In 2016, Pfizer agreed to a $486 million settlement of the "Morabito Action" and sought coverage from Arch. *Id* Arch denied coverage for the "Morabito Action" on the grounds that it was an "Interrelated

Wrongful Act" with respect to the "Garber Action." *Id.* Pfizer filed suit against Arch and the parties filed cross-motions for summary judgment.

¶ 48    The Delaware Superior Court ruled in Pfizer's favor and held that the "Morabito Action" and the "Garber Action" were not "Interrelated Wrongful Acts." *Id.* at *10. The court held that the "Morabito Action" and the "Garber Action" were not "Interrelated" because the "Morabito Action" focused on false statements regarding Celebrex's cardiovascular risk, while the "Garber Action" focused on false statements regarding Celebrex's gastrointestinal risk. *Id.* The court rejected Arch's argument that the "Interrelated Wrongful Acts" provision should be read broadly to preclude coverage for claims that "share[d] 'any' commonality" with the "Garber Action." *Id.* at *9. The court concluded that Arch's interpretation was "strained" and "uncharacteristically broad" and held that only claims that were "fundamentally identical" were "Interrelated Wrongful Acts." *Id.*

¶ 49    In *First Solar, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 274 A.3d 1006, 1012-13 (Del. 2022), the Delaware Supreme Court abrogated *Pfizer* to the extent it evoked a "fundamentally identical" standard for relatedness. *First Solar* explained that the issue of whether a claim relates back to an earlier claim under a claims-made policy "is decided by the language of the policy, not a generic 'fundamentally identical' standard." *Id.* at 1013. Nevertheless, *First Solar* agreed with *Pfizer*'s holding that the "Morabito Action" and "Garber Action" were not Interrelated Wrongful Acts, noting that *Pfizer* "addressed two claims about different side effects, with different omissions and misrepresentations. The claims overlapped in that they involved the same drug. But the Wrongful Acts [in *Pfizer*]—the misrepresentations made about gastrointestinal and

cardiovascular health risks, respectively—were substantively different, relying on different concepts, pharmaceutical trials, and statements." *Id.* at 1016.

¶ 50 The analysis in *Pfizer* and *First Solar* supports our conclusion here. The 2018 lawsuit and the arbitration demand are substantively different. The 2018 lawsuit was based on plaintiffs' failure to share corporate records, whereas the arbitration demand was based on plaintiffs' alleged misappropriation of corporate assets.

¶ 51 Similarly, in *South Dakota Network, LLC v. Twin City Fire Insurance Co.*, No. 4:16-CV-04031-KES, 2017 WL 4233019 (D.S.D. Sept. 22, 2017), the District of South Dakota applied South Dakota law to distinguish between (1) a 2013 demand letter and draft complaint from the plaintiff's supplier concerning a billing dispute, and (2) a 2015 lawsuit by the same supplier.. Based on key differences between those two events, the court held they were not "Interrelated Wrongful Acts." *Id.* at *8.

¶ 52 In 2013 and 2014, Twin City issued consecutive D&O liability policies to the plaintiff, a telecommunications company. *Id.* at *1. The policies defined "Interrelated Wrongful Acts" as "wrongful acts 'that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives methodologies or causes.' " *Id.* at *7.

¶ 53 During the 2013 policy period, the plaintiff's supplier sent a demand letter and draft complaint to the plaintiff, alleging that the plaintiff committed anticipatory breaches of its operating agreement and of express and implied contracts with the supplier. *Id.* at *3. The plaintiff did not report these events to Twin City within the specified period for the 2013 policy. *Id.* at *4.

¶ 54 During the 2014 policy period, the same supplier sent a cease-and-desist letter to the plaintiff. *Id.* In March of 2015, the supplier filed a lawsuit alleging that the plaintiff had entered into an agreement with AT&T regarding transmission costs that would negatively impact the supplier. *Id.* The plaintiff then submitted a claim for insurance coverage to Twin City. *Id.* Twin City denied coverage on grounds that the second lawsuit was related to the supplier's prior letter and draft complaint pursuant to the "Interrelated Wrongful Acts" definition, and thus, the plaintiff's claim was untimely. *Id.* The plaintiff filed suit seeking a declaration that it was entitled to coverage for the second lawsuit. *Id.* at *5.

¶ 55 The district court agreed with the plaintiff and held that the letter and draft complaint were not related to the second lawsuit. *Id.* at *7-8. The district court held that "common nexus" required a "causal connection or a link between the two 'wrongful acts.' " *Id.* at *7. The district court further held that "[i]t is not enough for the actions to be similar in nature or to have parallel facts." *Id.*

¶ 56 The *South Dakota Network* court's interpretation of the "common nexus" and "causally connected" definitions further support our conclusion here. The alleged breach of plaintiffs' obligation and the wrongful acts in the 2018 lawsuit do not bear any "causal connection" to the alleged breach of duty and wrongful acts in the arbitration demand. While the arbitration demand may set forth "similar" or "parallel facts" repeated from the 2018 lawsuit to explain the background of the parties' relationship, the arbitration demand does not allege that plaintiffs' misappropriation of funds was caused by plaintiffs' failure to disclose corporate records.

¶ 57 In *ACE American Insurance Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 800-01 (D. Md. 2008), the United States District Court for the District of Maryland applied Maryland law to

hold that a 2004 class action against Amerix (an Ascend subsidiary) seeking monetary damages was not related to either (1) a 2006 Maryland attorney general subpoena seeking information concerning Amerix's business practices or (2) a 2007 Texas attorney general civil demand regarding Amerix's credit counseling services. The court based this holding on the definition of "Interrelated Wrongful Acts" in a "prior acts" exclusion to a D&O liability policy issued by ACE American Insurance Company (ACE). *Id.*

¶ 58    In 2004, four private citizens filed a class action lawsuit against Amerix, alleging it had engaged in "unfair, deceptive and misleading debt management, credit counseling, budget planning and debt collection activities." (Internal quotation marks omitted.) *Id.* at 799.

¶ 59    In 2006, ACE issued the policy in question to Ascend. *Id.* at 791. The policy included an "Interrelated Wrongful Acts" provision, defined as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes." *Id.* at 793. In 2006, the Maryland attorney general served a subpoena on Amerix, seeking documents and information concerning Amerix's organizational structure and business practices. *Id.* at 791. Ascend submitted a claim for coverage to ACE. *Id.* In 2007, the Texas attorney general initiated a civil demand regarding Amerix's marketing of credit counselling services in violation of the Texas Deceptive Trade Practices and Consumer Protection Act. *Id.* at 792. Ascend then submitted a second claim for coverage to ACE. *Id.*

¶ 60    ACE denied coverage for the Maryland and Texas attorney general matters on the grounds that a 2004 class action brought against Amerix was an "Interrelated Wrongful Act" that preceded

the policy period, thereby precluding coverage under the "prior acts" exclusion. *Id.* ACE then filed a declaratory judgment action seeking confirmation of its position. *Id.*

¶ 61    The district court disagreed with ACE and held that the Maryland and Texas attorney general matters were not related to the 2004 class action. *Id.* at 794. The court reviewed the ACE policy's definition of "Interrelated Wrongful Acts" and framed the issue as whether the attorney general matters and the 2004 class action "arose out of the same occurrence of wrongful acts." *Id.* at 798. The district court concluded that the attorney general matters and the 2004 class action were "different in scope and time." *Id.* at 800. It also rejected ACE's argument that the class action allegations and the conduct investigated by the state attorneys general were "the same or interrelated" in terms of the "overall context" of the alleged bad acts. *Id.* at 798. The district court further emphasized that the class action was a private action seeking monetary damages, while the attorney general matters were governmental proceedings seeking injunctive relief and penalties. *Id.* at 801.

¶ 62    The District Court for the District of Maryland's interpretation of the "Interrelated Wrongful Acts" definition in the ACE policy supports our conclusion here. The 2018 lawsuit was a Chancery Division proceeding in the Cook County Circuit Court, seeking only injunctive relief. The arbitration demand was a private proceeding in which the claimants sought substantial compensatory and punitive damages. The 2018 lawsuit and the arbitration demand also do not arise out of "the same occurrence or wrongful acts." The "occurrence and wrongful act" giving rise to the 2018 lawsuit was plaintiffs' failure to provide books and records, whereas the "occurrence and wrongful act" giving rise to the arbitration demand was plaintiffs' alleged

improper loans, expense reimbursements, salaries, and other forms of misappropriation of corporate funds.

¶ 63    Finally, Great American provides no authority supporting its argument that a separate, later proceeding in a different forum that includes no overlapping claims can plausibly be considered an "amended complaint" with respect to a separate, earlier proceeding. Instead, Great American relies on *Hanover Insurance Co. v. R.W. Dunteman Co.*, 446 F. Supp. 3d 336 (N.D. Ill. 2020). *R.W. Dunteman* stands for the unremarkable proposition that a pleading that amends the original complaint in the same proceeding in the same forum—even where it adds numerous new causes of action—constitutes the same "claim" as the original complaint. *Id.* at 344 ("The [second amended complaint] is part of a single proceeding initiated by the filing of the Original Complaint."). Great American admits that the circumstances in *R.W. Dunteman* were not the same as those in this case.

¶ 64    In *R.W. Dunteman*, the original complaint brought a single count for declaratory judgment in relation to the rights of the estate of an ex-wife following divorce proceedings, including rights related to the estate's ownership of stock and the alleged transfer of stock interests to her sons. *Id.* at 338-39. As discovery proceeded, the plaintiff filed an amended complaint and second amended complaint. *Id.* at 339. The second amended complaint added multiple new defendants, including the sons and the company in which the ex-wife's estate held stock. *Id.* It also added multiple new causes of action to the original count for declaratory relief. *Id.* Analyzing a similar "Related Wrongful Acts" provision to the one in the 2018-2019 policy here, the court held that "the Estate lawsuit is a single proceeding and thus a single Claim." *Id.* at 344. It further held that the original

and amended complaints generally "alleged shortchanging of Jane and then her estate" and "allege[d] common damages." *Id.* at 346. The court concluded that the "additional allegations in the [second amended complaint] are consistent with the Original Complaint's allegations that Jane's ownership interest has been wrongfully reduced" (*id.*); thus, those two pleadings were "clearly Related Claims" (*id.* at 347).

¶ 65    Neither *R.W. Dunteman* nor any other authority supports the argument that the arbitration demand—a new pleading, in a new proceeding, with no overlapping causes of action—can be considered an "amended complaint" with respect to the 2018 lawsuit. Nor does Great American present any authority supporting a finding that the two separate actions can fall under its "amended complaint" theory where they are not otherwise deemed "Related Wrongful Acts."

¶ 66                                    III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 68    Affirmed.

***Chicago Restaurant Management Group, LLC v. Great American Insurance Co.*,**
**2025 IL App (1st) 232353**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-13791; the Hon. Catherine A. Schneider, Judge, presiding. |
| **Attorneys for Appellant:** | James H. Kallianis Jr. and Andrew J. Candela, of Skarzynski Marick & Black LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | James R. Figliulo and William J. Sullivan, of Smith Gambrell & Russell, of Chicago, for appellees Chicago Restaurant Management Group, LLC, David Flom, and Matthew Moore.<br><br>Jeffrey A. Soble and Mason D. Roberts, of Foley & Lardner LLP, of Chicago, for other appellee. |