**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 14-2327**

———————————

W.C. AND A.N. MILLER DEVELOPMENT COMPANY,

       Plaintiff - Appellant,

    v.

CONTINENTAL CASUALTY COMPANY,

       Defendant - Appellee.

———————————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George J. Hazel, District Judge. (8:14-cv-00425-GJH)

———————————

Argued: October 28, 2015      Decided: December 30, 2015

———————————

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Paul Joseph Kiernan, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellant. Richard A. Simpson, WILEY REIN LLP, Washington, D.C., for Appellee. **ON BRIEF:** Gary P. Seligman, Ashley E. Eiler, WILEY REIN LLP, Washington, D.C., for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this case we must determine whether an insurance company properly denied coverage to its insured. In 2006, entities and individuals related to Appellant W.C. & A.N. Miller Development Company (Miller) were sued in a contract dispute. Subsequently, in 2010, Miller entered into a liability insurance contract with Appellee Continental Casualty Company (Continental). Miller itself was sued in 2010 in a fraudulent conveyance action seeking recovery on the judgment entered in the 2006 lawsuit. Miller tendered the 2010 suit to Continental, seeking coverage of defense costs. Continental, however, determined that the 2010 lawsuit alleged "interrelated wrongful conduct" with the allegations made in the 2006 lawsuit brought against entities related to Miller. Because allegations of such interrelated wrongful conduct constituted a "claim" first made in 2006, before the policy period, Continental denied coverage. Miller went on to successfully defend the 2010 lawsuit at its own cost.

In 2014, Miller sued Continental for breach of the insurance contract and sought as damages the costs it incurred defending itself in the 2010 lawsuit. The crux of the parties' dispute is whether the allegations in the 2006 and 2010 lawsuits are, indeed, interrelated wrongful acts as defined by the insurance policy. The district court determined that Continental properly denied coverage. We now affirm.

2

I.

A.

In the early 2000s, one of the principals of Miller, Edward J. Miller, Jr., founded a land development company, Haymount Limited Partnership (Haymount). Miller owned upwards of 80% of Haymount at all relevant times. Edward J. Miller, Jr., is the chairman of Miller as well as the President of Haymount. Haymount's goal was to develop 1,700 acres of land along the Rappahannock River in Virginia's Caroline County.

In order to develop the property, Haymount required considerable financing. On September 10, 2002, Haymount entered into an agreement with International Benefits Group, Inc. (IBG). IBG agreed to introduce Haymount to third-party lenders in exchange for a finder's fee of $3 million if Haymount secured a loan as a result of IBG's introductions. On November 8, 2002, Haymount entered into a similar arrangement with American Property Consultants, Ltd. (APC). This agreement provided that APC, too, would receive a finder's fee if a loan to Haymount resulted from any of APC's introductions to lenders.

Haymount eventually secured a $14 million loan from General Motors Acceptance Corporation Residential (GMAC). Haymount then paid a finder's fee to APC and terminated their agreement. Upon learning of the GMAC loan, IBG also sought payment of its fee and sent Haymount a list of lenders to whom IBG had introduced

3

Haymount.  The list of introduced lenders included GMAC. Haymount refused to pay the $3 million fee and terminated its agreement with IBG on June 25, 2004.  IBG filed for Chapter 11 bankruptcy less than a month later, allegedly as a direct result of Haymount's failure to pay its fee.

B.

In 2006, IBG sued in the District of New Jersey seeking payment of the $3 million fee it claimed it was owed under the agreement with Haymount.[1]  IBG named several defendants: Haymount; Westminster Associates II, Inc. (Westminster), another development company that invested in Haymount; John A. Clark (Clark), the owner of Westminster; Edward J. Miller, Jr.; and APC.  IBG asserted causes of action for breach of contract, unjust enrichment, tortious interference, common law civil conspiracy, and state law statutory conspiracy.  Through their motions to dismiss and for summary judgment, the defendants successfully narrowed the claims to one: IBG's claim for breach of contract.  On January 8, 2010, the district court entered judgement against Haymount, among others, on IBG's breach of

---

[1] Technically, the bankruptcy trustee, Jonathan Kohn, was the plaintiff in the action; however, for simplicity's sake, we refer to IBG as the plaintiff in both the 2006 and 2010 actions even though both were brought by the trustee.

contract claim for the sum of $3 million plus interest, for a total judgment of $4,469,158.

Eight months after the judgment in the 2006 lawsuit, on October 29, 2010, IBG again sued Haymount and related parties. The 2010 lawsuit alleged that the defendants took actions to render themselves judgment proof so that IBG could not collect on the judgment entered in its favor after the 2006 lawsuit. In this second suit, IBG named as defendants, among others, Haymount, Miller, Edward J. Miller, Jr., and Clark. The causes of action asserted in the 2010 lawsuit included fraudulent transfer, fraudulent conveyance, common law and statutory conspiracy, creditor fraud, and aiding and abetting. The complaint in the 2010 action detailed the Haymount development project, the ownership structure of Haymount, the events leading to the contract between IBG and Haymount, and the course of the 2006 lawsuit giving rise to the judgment in IBG's favor.

Miller entered into a liability insurance contract with Continental in 2010. Miller tendered this second lawsuit to Continental seeking coverage of defense costs. Continental denied coverage as being outside the scope of the policy. Miller therefore proceeded with the defense at its own expense.

The district court granted summary judgment to the defendants. The court concluded that the challenged transfers were legitimate transfers to a secured creditor senior to IBG

5

and were not, therefore, fraudulent conveyances designed to defeat IBG's judgment. The Third Circuit affirmed. Kohn v. McGuire Woods, 541 F. App'x 163 (3rd Cir. 2013).

C.

Miller filed the lawsuit that is the subject of this appeal on February 12, 2014. Miller alleges that Continental wrongfully denied coverage under the policy and should be required to pay the costs Miller incurred defending the 2010 lawsuit.

The policy, J.A. 35-75, contains several relevant provisions. The policy includes coverage for employment practices liability, directors and officers liability, and entity liability. General terms and conditions at the beginning of the policy apply throughout. Under the policy, Continental will provide coverage to Miller for claims against Miller made during the coverage period for a wrongful act by an insured person. The policy coverage period is November 1, 2010 through November 1, 2011.[2] A "claim" is a demand for damages or relief,

---

[2] Although the 2010 complaint was filed on October 29, 2010, the policy provides that a claim is "deemed made . . . on the earliest of the date of service upon or other receipt by any Named Company Insured of a complaint . . . ." J.A. 43. The record indicates that Miller was served the 2010 complaint "on or about November 4, 2010." J.A. 123. Thus, the October filing (Continued)

6

including a civil action, against an insured. The insurance policy covers claims made against subsidiaries of Miller such as Haymount.

The policy provides, however: "More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on . . . the date on which the earliest such **Claim** was first made. . . ." J.A. 43 (emphases in original). In other words, if more than one claim involving interrelated wrongful acts is made against Miller or its subsidiaries, the multiple claims are considered a single claim made on the date on which the earliest of the claims was made. Further, the policy expansively defines "interrelated wrongful acts" as "any **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." J.A. 39 (emphasis in original). From this language, Continental reasoned that the acts alleged in the 2006 lawsuit and the fraudulent conveyance and other acts alleged in the 2010 lawsuit were interrelated wrongful acts constituting a single "claim." Under the terms of the policy, such a claim should be deemed to have been made in 2006, before the policy coverage period began

---

date of the 2010 lawsuit did not itself automatically preclude coverage under the policy.

on November 1, 2010. Continental therefore concluded the claim was not insured by the policy.

After some limited discovery, Continental moved for judgment on the pleadings and Miller moved for summary judgment. On November 7, 2014, the district court granted Continental's motion and denied Miller's motion. The district court found that the allegations in the 2010 lawsuit were "interrelated wrongful acts" with the allegations in the 2006 lawsuit and, therefore, pursuant to the policy, that the 2010 claim was deemed to have been made in 2006.

The district court agreed with Continental that under the policy's "broad[]" definition of interrelated wrongful acts, J.A. 298, the 2006 and 2010 lawsuits were related and "shared a common nexus" because they involved allegations of a common scheme involving the same claimant, the same fee commission, the same contract, and the same real estate transaction. J.A. 300. In addition to finding the existence of an alleged common scheme, the district court found that the alleged common scheme "logically and causally" connected the 2006 and 2010 actions: "but for the alleged actions of [Haymount], Mr. Miller, and others trying to avoid payment to IBG, the 2010 Lawsuit would never have been filed." J.A. 303. Accordingly, the district court concluded that the 2010 lawsuit constitutes part of the claim brought in 2006 and that Continental properly denied

8

coverage because the claim was made before the commencement of the policy period on November 1, 2010.

This appeal followed.

II.

We review de novo the district court's ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and in doing so, apply the standard for a Rule 12(b)(6) motion. Butler v. United States, 702 F.3d 749, 751–52 (4th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotations omitted). We review the district court's denial of summary judgment de novo. See Nat'l City Bank of Ind. v. Turnbaugh, 463 F.3d 325, 329 (4th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

A.

In this case, we must determine whether the district court properly interpreted and applied the provisions of the insurance contract. The district court sat in Maryland and, therefore, Maryland choice of law rules apply. Wells v. Liddy, 186 F.3d 505, 521 (4th Cir. 1999). In the absence of a contractual choice of law provision, Maryland applies the doctrine of lex loci contractus. Allstate Ins. Co. v. Hart, 611 A.2d 100, 101 (Md. 1992). "The locus contractu of an insurance policy is the state in which the policy is delivered and the premiums are paid." Cont'l Cas. Co. v. Kemper Ins. Co., 920 A.2d 66, 69 (Md. 2007) (citation and internal quotations omitted). Here, the policy was delivered to Miller in Maryland. Maryland's law of contracts governs interpretation of the policy.

"Under Maryland law, insurance policies are interpreted in the same manner as contracts generally; there is no rule in Maryland that insurance policies are to be construed most strongly against the insurer." Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co., 67 F.3d 63, 65 (4th Cir. 1995) (citing Collier v. MD-Individual Practice Ass'n, 607 A.2d 537, 539 (Md. 1992)). "Clear and unambiguous language, however, must be enforced as written and may not yield to what the parties later say they meant." Id. (citing Board of Trs. of State

10

Colls. v. Sherman, 373 A.2d 626, 629 (Md. 1977)).  Unless there is an indication that the parties intended to use words in a special technical sense, the words in a policy should be accorded their "usual, ordinary, and accepted meaning."  Bausch & Lomb, Inc. v. Utica Mut. Ins. Co., 625 A.2d 1021, 1031 (Md. 1993) (citations omitted). "A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term."  Id. (citation omitted).  However, where an insurance contract is ambiguous, "any doubt as to whether there is a potentiality of coverage under [the] insurance policy is to be resolved in favor of the insured."  Clendenin Bros. v. U.S. Fire Ins. Co., 889 A.2d 387, 394 (Md. 2006) (citation and internal quotations omitted).  Finally, under Maryland law, when policy language is unambiguous a judge may determine the applicability of a coverage provision.  Faw, Casson & Co. v. Everngam, 616 A.2d 426, 429 (Md. Ct. Spec. App. 1992).

As noted above, the policy's definition of "interrelated wrongful acts" is expansive: "any wrongful acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event."  J.A. 39.  We do not find this definition to be ambiguous, particularly on the facts before us, and will apply it in accordance with the ordinary meaning of the words used.

11

We conclude that the conduct alleged in the 2006 and 2010 lawsuits share a common nexus of fact and are, therefore, interrelated wrongful acts under the policy's definition. As the district court observed, the two lawsuits are linked by (1) a multitude of common facts: in particular, that Haymount did not pay IBG the $3 million finder's fee; (2) a common transaction: the contract between Haymount and IBG; and (3) common circumstances: namely, Haymount's attempts to secure financing for its land development project in Virginia. These elements logically and causally connect the two lawsuits. Absent Haymount's breach of its contract and other alleged torts, IBG would not have sued for damages in 2006, nor would it have sued for enforcement of the 2006 judgment in 2010. Thus, we agree with the district court that the 2006 and 2010 lawsuits share a common nexus: "an alleged scheme involving the same claimant, the same fee commission, the same contract, and the same real estate transaction." J.A. 300.

B.

Miller attempts to avoid this straightforward conclusion by characterizing the allegations in the two lawsuits as alleging merely a "common motive" which is insufficient to establish the

12

interrelatedness of the 2006 and 2010 lawsuits.[3] In support, Miller urges us to adopt the reasoning of <u>ACE Am. Ins. Co. v. Ascend One Corp.</u>, 570 F. Supp. 2d 789 (D. Md. 2008).

The insured in <u>ACE</u> was the subject of an investigation by state attorneys general for allegedly continuing harmful business practices related to the marketing of consumer credit repair products which had already been the subject of a U.S. Senate investigation and a consumer class-action. <u>Id.</u> at 791-92. When the insured tendered the investigative subpoenas to its insurer for coverage of its defense costs, the insurer denied coverage on the grounds that the business practices being investigated by the state attorneys general were the same as those giving rise to the earlier consumer class action. <u>Id.</u> The district court in <u>ACE</u>, however, disagreed with the insurer and held that a subsequent lawsuit based on similar wrongful business practices, but differing in time and factual specifics from the original wrongful acts, were not interrelated as defined in the policy at issue. <u>Id.</u> at 794.

---

[3] Ultimately, it is immaterial that Miller prevailed on many of the causes of action in the 2006 lawsuit and on all of the causes of action in the 2010 lawsuit. For the purposes of determining interrelatedness, we look only to "wrongful acts" as alleged in the 2006 and 2010 complaints, not as ultimately adjudicated on the merits. J.A. 57 (defining "wrongful act" as "any actual <u>or alleged</u>" act) (emphasis added).

In reaching its conclusion, the ACE court distinguished the facts underlying the two allegedly related claims there from the claims in other cases where courts found a sufficient factual nexus to render two claims interrelated. The cases distinguished by the ACE court are instructive here. In those cases, the interrelated claims were based on the same misleading statement, Zunenshine v. Exec. Risk Indem., Inc., No. 97 Civ. 5525 (MBM), 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998), aff'd, 182 F.2d 902, 1999 WL 464988 (2d Cir. 1999); the same agreement to sell stocks, Home Ins. Co. of Ill. (N.H.) v. Spectrum Info. Techs., Inc., 930 F. Supp. 825, 850 (E.D.N.Y. 1996); the same omissions in the same proxy literature, Ameriwood Indus. Int'l Corp. v. Am. Cas. Co. of Reading, Pa., 840 F. Supp. 1143, 1152 (W.D. Mich. 1993); and the same development of an industrial park and one party's attempts to interfere with the development, Bensalem Twp. v. Int'l Surplus Lines Ins. Co., Civ. A. No. 01-5315, 1992 WL 142024, at *2 (E.D. Pa. June 15, 1992), rev'd on other grounds, 38 F.3d 1303 (3d Cir. 1994).

Contrary to Miller's protestations, this case has more in common factually with the cases distinguished by the ACE court

14

than with <u>ACE</u> itself.[4] Here, the allegations in the 2006 and 2010 lawsuit arise out of the same land development project, involve the same contract to secure financing, implicate a dispute over the same fee, and were brought by the same claimant. This factual web creates a common nexus sufficient to make the claims brought against Miller in 2006 and 2010 interrelated under the policy's broad definition of "interrelated wrongful acts."[5]

Because they involve interrelated wrongful acts, the 2010 lawsuit and the 2006 lawsuit are part of the same claim under the policy. Pursuant to the policy provisions, we deem the claims in the 2010 lawsuit "first made," J.A. 43, on the date on

---

[4] We find the other main cases cited by Miller, <u>FDIC v. Mmahat</u>, 907 F.2d 546 (5th Cir. 1990), and <u>Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.</u>, 873 F.2d 229 (9th Cir. 1989), similarly unpersuasive. Miller wishes us to construe the current case as a "common business practices" or "common motive" case, but we decline to do so because of the factual congruence underlying the allegations in both the 2006 and 2010 lawsuits.

[5] Miller also argues that the breach of contract claim in the 2006 lawsuit cannot serve as a foundational "wrongful act" for the interrelatedness analysis because the policy does not cover loss from breaches of contract. <u>See</u> J.A. 59. Assuming Miller is correct on this point—and we are not convinced that it is—the facts alleged to support the other causes of action in the 2006 lawsuit—unjust enrichment, tortious interference, and civil conspiracy—are sufficiently related to those pleaded in the 2010 lawsuit, alleging fraudulent conveyance, fraud, and civil conspiracy, to render the conduct alleged in both lawsuits "interrelated" pursuant to the policy's definitions.

15

which the 2006 lawsuit was filed—March 17, 2006. As the district court determined, because March 17, 2006 is outside the policy period, Continental properly denied coverage.

For the foregoing reasons, we affirm.

AFFIRMED