**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1068

NAVIGATORS INSURANCE COMPANY; SWISS RE CORPORATE SOLUTIONS AMERICA INSURANCE CORPORATION; FREEDOM SPECIALTY INSURANCE COMPANY; ALLIED WORLD NATIONAL ASSURANCE COMPANY; QBE INSURANCE CORPORATION; CONTINENTAL CASUALTY COMPANY; XL SPECIALTY INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; ARGONAUT INSURANCE COMPANY,

Plaintiffs - Appellants,

and

ENDURANCE AMERICAN INSURANCE COMPANY,

Plaintiff,
v.

UNDER ARMOUR, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:22-cv-02481-RDB)

Argued:  October 22, 2025                    Decided:  January 20, 2026

Before QUATTLEBAUM, HEYTENS, and BERNER, Circuit Judges.

Reversed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Heytens and Judge Berner joined.

———————————

**ARGUED:** Richard A. Simpson, WILEY REIN LLP, Washington, D.C., for Appellants. Michael T. Sharkey, PERKINS COIE LLP, Washington, D.C., for Appellee. **ON BRIEF:** Margaret T. Karchmer, Anna J. Schaffner, WILEY REIN LLP, Washington, D.C., for Appellant Continental Casualty Company. Michael P. O'Day, Alexa Pauline Ain, DLA PIPER LLP (US), Baltimore, Maryland, for Appellant National Union Fire Insurance Company of Pittsburgh, PA. Gabriela Richeimer, WERNER AHARI MANGEL LLP, Washington, D.C., for Appellant XL Specialty Insurance Company. John R. Solter, Jr., AZRAEL, FRANZ, SCHWAB, LIPOWITZ & SOLTER, LLC, Baltimore, Maryland, for Appellants Swiss Re Corporate Solutions America Insurance Corporation and Freedom Specialty Insurance Company. Paul T. Curley, Briana Semenza, KAUFMAN BORGEEST & RYAN LLP, Valhalla, New York, for Appellant Swiss Re Corporate Solutions America Insurance Corporation. Travis Wall, Gordon Smith, KENNEDYS CMK LLP, San Francisco, California, for Appellant Allied World National Assurance Company. John J. Murphy, WALKER, MURPHY & NELSON LLP, Rockville, Maryland, for Appellants Navigators Insurance Company and Argonaut Insurance Company. Leslie S. Ahari, WERNER AHARI MANGEL LLP, Washington, D.C., for Appellant QBE Insurance Company. Geoffrey W. Heineman, John J. Iacobucci, Jr., ROPERS MAJESKI PC, New York, New York, for Appellant Argonaut Insurance Company. Darius N. Kandawalla, Jordan W. Ziolkowski, BAILEY CAVALIERI LLC, Columbus, Ohio, for Appellant Freedom Specialty Insurance Company. Jonathan G. Hardin, Molly A. Olds, PERKINS COIE LLP, Washington, D.C., for Appellee.

———————————

2

QUATTLEBAUM, Circuit Judge:

Anyone who has had to file an insurance claim knows how important the terms of the policy are. Take car insurance. After paying premiums every month, one day while you're minding your own business driving down the road, someone rear-ends you. You file a claim to cover the dent in your bumper only to learn about the policy's limits and exclusions. Whether your claim is covered and what the insurance company must pay depend on the written terms of the policy. That's just as true for a multi-million-dollar claim arising from alleged corporate misconduct—like the one in this appeal. And that makes sense. After all, an insurance policy is a contract. As with any contract, the words of the policy matter. This appeal illustrates that principle.

For almost a decade, the sports apparel and equipment company Under Armour has faced legal claims and government investigations regarding two types of conduct—its public statements forecasting strong financial prospects and certain accounting practices. Under Armour asked its insurance companies to pay for its legal expenses and liabilities for those matters under directors and officers insurance policies Under Armour had purchased. The insurers agreed they owed coverage. But they insisted the insurance claims over the public statements and the accounting practices were a single claim subject to one limit on the total coverage owed. Under Armor disagreed. It claimed they were separate claims that implicated two coverage limits. This was a significant disagreement. If Under Armour had a single claim, coverage would be capped at $100 million. If Under Armour had separate claims, Under Armour would have an additional $100 million in coverage. So, $100 million hangs in the balance.

3

To resolve the disagreement—just as we would with questions about coverage for a dented bumper—we look to the language of the policy. Looking at that language, the district court ruled for Under Armour, finding two separate policy limits applied because there were separate, unrelated claims. We disagree. Under the policy's language, Under Armour's public financial forecasts and its accounting practices are a single claim because, as the policy defines that term, they are "logically or causally related." J.A. 491. Thus, they form a single insurance claim. So, we reverse.

## I. BACKGROUND

### A. Under Armour's Corporate History[1]

Founded in 1996 by 23-year-old former University of Maryland football player Kevin Plank, Under Armour develops, manufactures, markets and distributes sports apparel, footwear and accessories. The publicly traded company took the sports apparel industry by storm. By the end of 2014, Under Armour had surpassed Adidas to become the second-largest sportswear brand by U.S. revenue, behind only Nike.

Under Armour primarily derived its revenue from wholesale sales to retailers. By January 2016, the business of one of its major customers—Sports Authority—was suffering. This led to questions about whether Sports Authority could pay Under Armour

---

[1] Our description of the facts comes primarily from the pleadings and the documents attached to them. The attachments include the insurance policies and endorsements, the pleadings from the legal claims against Under Armour and the government's documents from the investigations into the company. Of course, Under Armour disputes the allegations in the lawsuits and the government investigations. Our description of them should not be construed to mean we find that they are true. We describe the allegations as we find them because they form the basis of insurance claims about the public statements forecasting Under Armour's strong financial prospects and certain accounting practices.

4

the substantial receivables it owed. Under Armour attempted to dispel those concerns. In its annual federal filing in February 2016, Under Armour stated that it did not believe that the company's receivables would be materially impacted by Sports Authority's business problems.

But the next month, things with Sports Authority went from bad to worse. It filed for Chapter 11 bankruptcy and closed a third of its stores. Despite this, Under Armour reiterated its positive outlook. In a press release, Under Armour represented that it "continue[d] to expect 2016 net revenues of approximately $4.95 billion, representing growth of 25% over 2015, and 2016 operating income of approximately $503 million, representing growth of 23% over 2015, in line with the financial targets outlined in" the company's January 2016 earnings release. J.A. 819.

Two months later, Sports Authority's business had deteriorated even further. It decided to liquidate rather than reorganize its operations. As a result, Under Armour revised its position to reflect that it "was only able to recognize $43 million of the originally planned $163 million in revenues with [] Sports Authority for 2016." J.A. 819. What's more, on the day before and the day of Sports Authority's liquidation announcement, Under Armour insiders, including its chairman and CEO, Plank, sold millions of dollars of Under Armour stock at a significant profit. In the face of all this, Under Armour expressed confidence. It estimated an increase in operating income and net revenue growth of 24%, and Plank described the company's brand "momentum" as "stronger than ever." J.A. 820 (internal quotation marks omitted).

Not everyone was convinced. In August 2016, Under Armour shareholder Chad Sorensen exercised his rights to inspect and copy the company's books, records and documents to "investigate potential wrongdoing, mismanagement and breaches of fiduciary duties by" Under Armour's board, discuss "proposed reforms" and prepare for a potential derivative action. J.A. 817. Sorensen sought, among other documents, those related to Under Armour's decisions concerning Sports Authority's bankruptcy.

Later that fall, Sorensen sent the company another letter—a derivative demand letter. He asked Under Armour's board of directors, on behalf of all shareholders, to take action against Plank and other Under Armour officers. Sorensen alleged that Under Armour "issued false and misleading statements about the effect of the" Sports Authority bankruptcy on Under Armour's finances. J.A. 832. According to Sorensen, these statements inflated Under Armour's stock price, allowing the company's insiders to sell high before the share price dropped.

And drop it did. In the fourth quarter of 2016, Under Armour's earnings finally slowed. Its Q4 earnings report revealed an end to the company's 26-quarter streak with 20% or greater sales growth. By the summer of 2017, the company's share price had fallen roughly 25%.

As Under Armour's financial condition came to light, its legal problems mounted. In February 2017, Under Armour shareholder Brian Breece filed a class action against the company, Plank and another of the company's officers, asserting violations of federal securities laws. Breece alleged that the defendants "made false and/or misleading statements as well as failed to disclose material adverse facts about [Under Armour]'s

6

business, operations, and prospects." J.A. 27. The complaint faulted Under Armour for not indicating that its "revenue and profit margins would not be able to withstand[] the heavy promotions, high inventory levels and ripple effects of numerous department store closures and [the] bankruptcy of [] Sports Authority." J.A. 27. One month after Breece filed his class complaint, the district court consolidated it with two related lawsuits under the caption *In re Under Armour Securities Litigation*.

Also, between February and May of 2017, Under Armour received additional derivative demands from other shareholders. Some of the demands, like one sent by Shawn Luger in February 2017, addressed Plank's trading and Under Armour's purportedly false and misleading statements.

In June 2017, the government got involved. The Securities and Exchange Commission subpoenaed documents from Under Armour as part of an investigation into whether the company had violated federal securities laws. The SEC sought, among other records, Under Armour's financial and accounting documentation from 2015 and 2016. The subpoena also requested:

> 18. For the period from January 1, 2016 through December 31, 2016, all documents concerning the company's efforts to achieve a quarterly revenue growth rate of at least twenty percent.
>
> . . .
>
> 20. Documents reflecting stock sales by any company employees from October 1, 2016 through January 31, 2017.

J.A. 1164. The investigation remained confidential, but Under Armour did notify its primary directors and officers liability insurer.

7

The SEC's investigation and the securities litigation continued over the next few years. In March and June of 2018, the SEC subpoenaed more documents from Under Armour, including those concerning the "shifting of revenue between fiscal quarters or years." J.A. 1171. Additional subpoenas touching on revenue-shifting documentation and other records followed in March and November of 2019.

In August 2017, the plaintiffs in the securities litigation amended their complaint to expand on the allegations in the *Breece* complaint. The plaintiffs alleged that, despite slowing business, Under Armour projected strength "while downplaying and concealing [Under Armour]'s ballooning inventory, liquidations, and gross margin compression." Consolidated Amended Complaint at 10, *In re Under Armour Secs. Litig.*, No. 1:17-cv-00388-RDB (D. Md. Aug. 9, 2017), ECF No. 30. According to the securities litigation plaintiffs, the company "resorted to lowering sales prices[,] offering promotions," and liquidating its "excess inventory at steep discounts." *Id.* at 9–10. And while Under Armour's stock price remained "artificially inflated," Plank sold $138.2 million in shares. *Id.* at 10.[2]

By December 2018, several of the shareholders who issued derivative demands had brought derivative lawsuits against Under Armour. For instance, Luger joined in a state-court derivative class action. A consolidated federal derivative lawsuit also cropped up. At least in part, the derivative actions concerned allegations similar to those in the initial

---

[2] A second amended complaint followed in November 2018. The pleading augmented the plaintiffs' allegations but retained the core of those found in the first amended complaint.

8

*Breece* complaint. These actions were eventually stayed pending the resolution of the securities litigation.

In August 2019, the district court dismissed the securities litigation. The district court determined that the plaintiffs failed to meet the heightened pleading standard required for their fraud claims under § 10(b) of the Securities Exchange Act. In particular, it found the plaintiffs had not adequately pled that the defendants acted with the required intent to deceive.[3] The plaintiffs appealed.

During the pendency of the appeal, in November 2019, the *Wall Street Journal* reported that the SEC and the Department of Justice had launched civil and criminal investigations, respectively, into whether Under Armour had shifted sales revenue between quarters "to appear healthier." Exhibit 2 at 2, *In re Under Armour Secs. Litig.* (D. Md. Nov. 18, 2019), ECF No. 106-4.

Prompted by the news reports, the plaintiffs in the securities litigation filed a handful of motions in district court. One motion sought relief from the dismissal of the action under Rule 60(b) of the Federal Rules of Civil Procedure because the matters addressed by the government investigations, which were previously not public, offered new evidence of scienter. Another motion—this one under Rule 62.1—sought an indicative ruling on the Rule 60(b) motion given that the dismissal remained on appeal.[4] The district court granted

---

[3] Because the plaintiffs did not state a claim under § 10(b), the district court also dismissed their other claims, which required the plaintiffs to allege predicate violations of § 10(b).

[4] The plaintiffs also moved to consolidate other lawsuits filed after the *Wall Street Journal* reports.

9

the motion for an indicative ruling, and we remanded the case for the district court to rule on the Rule 60(b) motion, *In re Under Armour Secs. Litig.*, 815 F. App'x 748 (4th Cir. 2020). The district court then granted the plaintiffs' Rule 60(b) motion.

In the summer of 2020—shortly before we remanded the securities litigation and the district court granted the plaintiffs' Rule 60(b) motion—the SEC notified Under Armour of its intent to pursue an enforcement action against Under Armour over the company's shifting of sales revenue between quarters. Specifically, the SEC contended Under Armour had pulled revenue expected in later quarters into earlier quarters to make its financial performance look better. The alleged misconduct spanned from the third quarter of 2015 through the fourth quarter of 2016.

In October 2020, the plaintiffs in the securities litigation amended their complaint for a third time. Following the SEC's lead, in addition to the allegations outlined in the plaintiffs' previous pleadings, the plaintiffs alleged that Under Armour "resorted to a slew of improper and/or concealed sales and accounting practices that violated Generally Accepted Accounting Principles ('GAAP') and SEC regulations." J.A. 178. The plaintiffs noted the government investigations.

Unlike the earlier iteration of the lawsuit, this one turned out well for the plaintiffs. Under Armour and the plaintiffs ultimately settled the securities litigation for $434 million. Under Armour also settled with the SEC for $9 million. The derivative litigation eventually settled as well.

10

## B. Under Armour's Insurance Policies

Under Armour had insurance for matters like those alleged in the litigation and the government's investigation and enforcement action. From February 2016 to February 2017, Continental Casualty Company provided primary directors and officers liability insurance to Under Armour. Continental issued a claims-made policy—which means it provided coverage only for claims made during the policy period, *see Gateway Residences at Exch., LLC v. Ill. Union Ins. Co.*, 917 F.3d 269, 271 (4th Cir. 2019)—with a $10 million coverage limit. Nine excess insurers, including Endurance American Insurance Company, each tacked on additional $10 million layers for a total of $100 million in coverage.

For the 2017–2018 policy year, Endurance provided primary coverage with a limit of $10 million. Other carriers, following form to the Endurance policy, added $90 million in excess coverage in $10 million layers for a total of $100 million in coverage.[5]

Continental and Endurance treated the Sorensen demands, the Luger demand and the *Breece* complaint as claims first made during the 2016–2017 term. Following the SEC settlement, Endurance determined that the government's allegations were related to those

---

[5] A follow-form policy contains the same terms and conditions employed by the underlying policy unless otherwise noted. The 2017–2018 excess insurers—Continental, Swiss Re Corporate Solutions American Insurance Corp. (a/k/a North American Specialty Insurance Co.), National Union Fire Insurance Co. of Pittsburgh, PA, Freedom Specialty Insurance Co., QBE Insurance Corp., Argonaut Insurance Co., XL Specialty Insurance Co. and Allied World National Assurance Co.—are the appellants. Under Armour settled with Endurance, so Endurance is not a party to this appeal. The excess carriers are. The excess insurers seem to agree that, because their policies follow form to the Endurance policy, our decision as to Endurance's coverage obligation under the 2017–2018 policy applies to them.

first made in the initial *Breece* complaint and the demands for which Endurance had accepted coverage under the 2016–2017 policy. Accordingly, Endurance concluded that the claims concerning the allegations in the government investigations constituted claims made prior to the 2017–2018 term and sought recoupment of monies it paid to Under Armour under the 2017–2018 policy. And the excess insurers followed suit. Essentially, Endurance and the 2017–2018 excess insurers sought to avoid paying the $100 million available under the 2017–2018 policy by tying the government investigation-related conduct—the accounting pull forwards—to the conduct at issue in the 2016–2017 claims—Under Armour's misleading statements.

The insurers based their position on the 2017–2018 policy language. The 2017–2018 policy provides coverage for loss on account of claims first made during the policy period.[6] The policy also contains a provision known as a single claims, or related claims, provision. Single claims provisions are coverage provisions which operate when claims made under multiple policy periods arise from related misconduct. *See W.C. & A.N. Miller Dev. Co. v. Continental Cas. Co.*, 814 F.3d 171, 175 (4th Cir. 2016). When a single claims provision applies—or the misconduct underlying the claims is sufficiently related per the policy language—the provision deems a later-made claim first made during the earliest policy year such that coverage does not attach under contracts issued for subsequent policy years. *See id.* at 175, 178 (discussing how single claims provision works); *see also* 3 NEW APPLEMAN LAW OF LIABILITY INSURANCE § 22.05 (Matthew Bender, Rev. Ed. 2020). The

---

[6] The policy bolds certain terms. We have omitted the policy's bolding. Unless we have defined a term in this opinion, we have also omitted the policy's capitalization.

single claims provision in the 2017–2018 policy is important because, if applicable, it reduces available coverage for Under Armour's misconduct to only that provided by the 2016–2017 policy.

Here, the single claims provision is purportedly found in two parts of the 2017–2018 Endurance policy—in the coverage section and in an endorsement. First, the coverage section states that:

> All Claims which arise out of the same Wrongful Act and all Interrelated Wrongful Acts of Insureds shall be deemed one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period.

J.A. 466. As amended by an endorsement, a Wrongful Act is defined as:

> [A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted . . . .

J.A. 499. Interrelated Wrongful Acts are:

> [A]ll Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

J.A. 464.

Second, an endorsement—or amendment—to the 2017–2018 policy alters the single claims provision "by the addition of" certain language. J.A. 491. Specifically, the endorsement provides that:

> All Claims . . . that arise out of the same fact, circumstance, situation, event, or Wrongful Act, or facts, circumstances, situations, events, or Wrongful Acts that are logically or causally related shall be deemed one Claim, which shall be deemed to be first made on the earliest that the first of any such Claims is made . . . .

13

J.A. 491.

Based on the single claims provision, the insurers determined that the government investigations involved the same common nexus of facts as the securities litigation and the derivative matters and were thus logically and causally related. Thus, the insurers insisted that they constituted a single claim which was first made in 2016 and thus subject to the 2016–2017 policy limits, not the 2017–2018 policy limits.

### C. Procedural History

Endurance and the other 2017–2018 insurers filed a declaratory judgment action against Under Armour about their coverage obligations. In their complaint, the insurers sought declarations that the securities litigation, the derivative litigation and the government investigations constituted claims first made before the 2017–2018 coverage period.[7] In asserting this, they alleged that the government investigations were sufficiently related to those other matters that they constituted a single claim which was first made in 2016 and thus subject to the 2016–2017 policy limits. In its answer, Under Armour asserted counterclaims for declaratory judgments in favor of coverage and for breach of contract. It alleged the government investigations were not sufficiently related to the securities litigation and the derivative litigation. According to Under Armour, the government investigations involved separate conduct and thus, losses resulting from this conduct were separate claims under the 2017–2018 Endurance policy.

---

[7] The insurers also requested declarations that the specific matter and prior notice exclusions in the 2017–2018 policy barred coverage for loss arising from these matters. As we will explain, we need not reach the applicability of these exclusions, so we will not outline them here. Other counts concerned Endurance's coverage obligations.

14

After the pleadings closed, the excess insurers and Under Armour both moved for judgment on the pleadings under Rule 12(c). The district court denied the insurers' motion and granted Under Armour's motion as to its declaratory judgment counterclaim against the insurers. It concluded that claims arising from the government investigations qualify as claims first made during the 2017–2018 policy period, rejecting the insurers' position that the government investigations, the securities litigation and the derivative litigation constituted a single claim. In reaching this conclusion, the district court first found the single claims provision in the coverage section of the policy to be narrower than the single claims definition in the endorsement. So, it held the endorsement controlled. Under the endorsement's definition, the district court determined that the government investigations did not arise from the same facts, circumstances, situations, events or Wrongful Acts as the initial *Breece* complaint and the 2016–2017 shareholder demands, nor did a "common nexus of facts" between the investigations and these matters have a sufficient logical or causal relation. J.A. 1130. Therefore, in the district court's view, they were not a single claim. To the district court, that meant coverage under the 2017–2018 policy attached to the claims involving the government investigations.

15

## II. DISCUSSION[8]

On appeal, we must decide whether Under Armour is entitled to coverage under the 2017–2018 policy for the costs incurred in responding to, defending against and settling the matters involving the government investigations.[9]

---

[8] We have jurisdiction over the insurers' appeal. *See* 28 U.S.C. § 1291.

[9] We review de novo a district court's grant or denial of a motion for judgment on the pleadings. *Gelin v. Maryland*, 132 F.4th 700, 713 (4th Cir. 2025). In reviewing an order on cross-motions for judgment on the pleadings, we accept the facts alleged by the non-moving party as true and draw all reasonable factual inferences in favor of the non-moving party. *See Affinity Living Grp., LLC v StarStone Specialty Ins. Co.*, 959 F.3d 634, 639 (4th Cir. 2020). And we review the motions separately, applying this standard to both motions. *Cf. Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (reviewing cross-motions for summary judgment). In addition to the allegations raised in the parties' pleadings, we may take judicial notice of matters of public record and may consider documents attached to the pleadings and to the parties' motions as long as the documents are authentic and integral to the pleadings. *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). Consistent with this principle, the parties agreed that the district court below could examine documents attached to the insurers' initial complaint and amended complaint which include, most importantly, all of the 2017–2018 insurance policies and endorsements. But the attachments also include pleadings from the lawsuits against Under Armour and the government's documents from the investigations into the company. Although neither party raises this issue, it is possible that the district court's consideration of this information effectively converted the Rule 12(c) cross motions to cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Cf. Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (indicating that an appellate court may determine that district court's consideration of evidence outside pleadings implicitly converted Rule 12 motion to Rule 56 motion so as to serve judicial economy by avoiding unnecessary remand). To the extent the district court's failure to do this formally was in error, it was harmless because no party claims more discovery was needed and because we would reach the same result construing the evidence in the light most favorable to the non-moving party. *See* FED. R. CIV. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Shears v. Ethicon, Inc.*, 109 F.4th 235, 241 (4th Cir. 2024) (noting error is harmless when we are "satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors'" (quoting *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531 (4th Cir. 2021))).

**A. The Public Statement Claims and the Accounting Claims Are Logically and Causally Related and Are Thus a Single Claim that Falls Under the 2016–2017 Policy**

To answer that question, we begin with the terms of the 2017–2018 Endurance policy. But to do that, we first must decide what language of the policy applies. The parties disagree on this point.

They disagree because the policy itself and the endorsement contain different single claims language. Recall that the single claims provision in the policy says that "[a]ll Claims which arise out of the same Wrongful Act and all Interrelated Wrongful Acts of Insureds shall be deemed one Claim . . . ." J.A. 466. And the policy defines Interrelated Wrong Acts to mean "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." J.A. 464. Under this language, the issue is whether the securities litigation and the derivative demands and litigation on the one hand and the government investigations on the other share "as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." J.A. 464.

The endorsement contains additional language about the single claims provision. It says that "[a]ll Claims . . . that arise out of the same fact, circumstance, situation, event, or Wrongful Act, or facts, circumstances, situations, events, or Wrongful Acts that are logically or causally related shall be deemed one Claim . . . ." J.A. 491. Under this language, we ask whether the securities litigation and the derivative demands and litigation

17

on the one hand, and the government investigations on the other, are "logically or causally related." J.A. 491.

The insurers contend the endorsement's definition is added to the coverage section's definition so that both are fair game. In contrast, Under Armour argues that the endorsement narrowed the scope of the coverage section's single claims provision and that, under this definition, the allegations aren't adequately related.

But this dispute doesn't matter here. Even assuming without deciding that Under Armour is right that only the endorsement language applies, the issues involved in the government investigations are logically and causally related to those involved in the earlier claims.

### 1. The Plain Meaning of "Logically or Causally Related" Suggests a Single Claim

To determine whether the allegations about Under Armour's accounting practices and misleading statements are "logically or causally related," J.A. 491, we start with the plain meaning of the phrase. In Maryland, courts construe language in an insurance policy based on the meaning that a reasonable person in the shoes of the parties would attribute to it.[10] *In re Featherfall Restoration, LLC*, 340 A.3d 237, 243 (Md. 2025) ("We focus, therefore, on the 'ordinary and accepted meaning' of the contract's plain language." (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 311 (Md. 2019))). "And

---

[10] In this diversity action, we must apply the law of the state in which the district court sits—Maryland. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). For insurance disputes, Maryland courts apply the law of the state where the insurance contract was made. *Allstate Ins. Co. v. Hart*, 611 A.2d 100, 101 (Md. 1992). Here, that is Maryland.

in doing so, we frequently consult dictionary definitions 'to identify the common and popular understanding of the words used in the contract as evidence of what a reasonable person in the position of the parties would have understood those terms to mean.'" *Id.* (quoting *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1054 (Md. 2022)).

We surveyed several dictionaries from around the time the policy was issued to determine the meaning of "logically or causally related." Starting with logically related, only one of the dictionaries defined "logically." *See Logically*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("In a logical manner; according to the principles of logic or the laws of sound reasoning.").[11]

Because the definition of "logically" refers to "logical," we looked to the same dictionaries for the meaning of that term. Logical means that which reasonably or rationally follows from something else. *See Logical*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("That follows as a reasonable inference or natural consequence."); *id.* ("Characterized by reason; rational, reasonable."); *Logical*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014) ("Necessary or to be expected because of what has gone before; that follows as reasonable."); *Logical*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("Based on earlier or otherwise known statements, events, or conditions; reasonable.").

---

[11] Unless otherwise noted, the additions to the second edition, published in 1993 and 1997, do not substantively modify the *Oxford English Dictionary* definitions we discuss. The *Oxford English Dictionary* moved online in 2000. These definitions also remain consistent with those found in the current version of the dictionary, the 2025 online edition.

19

Looking again at contemporaneous dictionaries, "related" means connected to or associated with something else. *See Related*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("Having relation *to*, or relationship *with*, something else."); *Related*, OXFORD ENGLISH DICTIONARY ADDITIONS SERIES (Vol. 1 1993) ("In *Comb.* with preceding noun."); *Related*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014) ("[C]onnected or associated, as by origin or kind; specif., connected by kinship, marriage, etc.; of the same family."); *Related*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("Being connected; associated.").

Synthesizing these definitions of "logically" and "related," two things are logically related when they are reasonably or rationally connected to or associated with one another. So, the question here is whether the conduct at issue in the derivative and securities litigation and in the government investigations fall within this meaning. They do.

To explain, let's revisit the alleged conduct from the two claims. The derivative litigation and the securities litigation involve claims about the public forecasts that Under Armour would continue to grow at the same pace despite the financial trouble, bankruptcy and liquidation of its major customer, Sports Authority. They also involve claims that, despite their optimistic public statements, Plank and other officers used inside information to sell Under Armour stock at a substantial profit.

The government investigations, at least when they began, involved these same issues. In its initial subpoena to Under Armour, the SEC requested, among other things, "all documents concerning the company's efforts to achieve a quarterly revenue growth rate of at least twenty percent" between January 1 and December 31 of 2016. J.A. 1164.

20

So, by that point, the government investigation involved not just "logically [and] causally related" conduct; it involved the same conduct.

True, the SEC's attention later shifted to include Under Armour's accounting practices. More specifically, the SEC investigated and later initiated an enforcement action based on Under Armour's pulling revenue expected in later quarters into the current quarter to make its financial performance in 2016 look better. But even though this is not precisely the same conduct as the public statements and the insider trading, it is logically related. This accounting manipulation is reasonably and rationally connected to the optimistic public statements about Under Armour's financial condition. The effect of both was to maintain the appearance of financial strength. More than that, pulling revenue forward bolstered the earlier quarter's revenues, creating an illusion of continued growth. This permitted Under Armour officials to plausibly make misleading public statements. After all, it would have been much harder to claim growth continued unabated if the books had shown that growth had already slowed.

The SEC explained this connection. In its order commencing cease-and-desist proceedings against Under Armour, the SEC said, "[w]ithout these pull forwards each quarter, Under Armour . . . would have missed its better than 20% revenue growth streak in the fourth quarter of 2015 and the third quarter of 2016." J.A. 1096. The SEC also reasoned that Under Armour's "failure to disclose material information about its revenue management practices [] rendered statements it made misleading," J.A. 1096, just as the initial *Breece* complaint faulted Under Armour for omitting "material adverse facts" about its business conditions, J.A. 27. Indeed, to head off "the possible negative impact on the

21

company's stock price that could result from missing" its greater than 20% growth estimates, Under Armour "sought to accelerate, or 'pull forward,' existing orders." J.A. 1096.

The same goes for causally related. Again looking to dictionaries from around the time of the policy period, "causally" means "[i]n a causal way, with causal force; in the manner of, or as being the cause; by way of cause and effect." *See Causally*, OXFORD ENGLISH DICTIONARY (2d ed. 1989). Combining the definitions of "causally" with those of "related," two things are causally related when they are connected or associated by cause or by cause and effect.

Here, the SEC's explanation of the connection between Under Armour's accounting pull forwards and allegedly false and misleading public statements also demonstrates why the two are causally related. To get out in front of the negative financial impact that could follow from missing its 20% growth estimates due to poor market conditions, Under Armour pulled forward its orders, which allowed it to continue forecasting its 20% target publicly. Its actions, as part of a single scheme, stemmed from a single goal—to convince its shareholders and the public that it was achieving 20% growth in spite of the trouble with Sports Authority and the market generally. Thus, the pull forwards and the allegedly misleading public statements derive from the same cause—a desire to continue to hit its growth estimate—and resulted in the same effect—Under Armour giving the illusion it was growing in line with its earlier projections.

22

For these reasons, Under Armour's pull forward accounting actions and its alleged misleading public statements, under the plain meaning of the policy language, are logically and causally related.

## 2. Caselaw

Resisting this conclusion, Under Armour claims caselaw supports its position.[12] But it only cites non-binding cases addressing factually distinct circumstances. Take *Perdue Farms, Inc. v. National Union Fire Insurance Co. of Pittsburgh*, 517 F. Supp. 3d 458 (D. Md. 2021). There, the plaintiffs, "growers and sellers of chickens," sought insurance coverage for two lawsuits. *Id.* at 459. One lawsuit concerned claims by chicken purchasers that Perdue had artificially kept chicken supply down. *Id.* at 459, 463. The second lawsuit involved claims by entities that raised chickens that Perdue had suppressed wages in their industry. *Id.* at 459, 462–63. When Perdue made a claim for the first lawsuit under a 2016 insurance policy and reported the second lawsuit under a 2017 policy, the insurer denied coverage under the 2017 policy on the ground that a single claims provision deemed the 2017 lawsuit related to the 2016 lawsuit. *Id.* at 459. The district court ruled for Perdue. It held that the two lawsuits did not arise "from a common nucleus of facts," nor did they bear a "logical or causal relationships to one another." *Id.* at 460, 462. The district court concluded that "the Complaints outline two distinct methods of anticompetitive conduct designed to achieve two separate collusive ends." *Id.* at 462.

---

[12] To be fair, both parties cite lots of cases that they insist support their positions. In reality, the cases are very fact specific, and none are on all fours. Most have parts that help and hurt both sides. We need not march through all of them, but we do evaluate two cases Under Armour heavily relied on at oral argument and one that the insurers emphasize.

But this case is not like that. In *Perdue Farms*, the allegedly related conduct was separate anticompetitive efforts to help improve profits. One scheme increased price by reducing supply and the other decreased cost by suppressing wages. It is true that, like this case, both allegations of conduct involved the same company, were anticompetitive in nature and helped improve profits. But that is too high a level of generality to show relatedness. Indeed, at that level of generality almost any conduct involving the same company would be sufficiently related. So, understandably, the court found the conduct from those two circumstances to be separate. In contrast, Under Armour's public forecasts of strong growth and its pull forward accounting measures are related on a more specific basis. As noted, they were interrelated parts of a single scheme—the accounting measures covered up Under Armour's actual financial condition, allowing its officers to make the public statements.

Under Armour also relies on *Home Insurance Co. of Illinois (New Hampshire) v. Spectrum Information Technologies, Inc.*, 930 F. Supp. 825 (E.D.N.Y. 1996). There, Spectrum Information Technologies shareholders alleged that the company misrepresented the value of a licensing agreement. *Id.* at 829. Not long afterwards, the SEC initiated a confidential investigation into the same conduct. *Id.* at 830. After the media reported on the SEC investigation, several new lawsuits popped up, which were eventually consolidated with the earlier filed matters. *Id.* at 831–32. After that consolidation, in addition to the licensing agreement allegations, shareholders asserted claims that Spectrum withheld the SEC investigation from the public, that it made false and misleading

24

statements about its earnings, that its directors and officers engaged in insider trading and that its then-CEO made false and misleading statements. *Id.* at 831–33.

In litigation over what coverage Spectrum's insurers owed for these claims, the insurers argued the conduct at issue in each of the claims "generally arose from the same facts and circumstances." *Id.* at 835. The district court concluded that the claims alleging Spectrum had misrepresented the value of its licensing agreement and withheld the SEC's investigation into those misrepresentations were distinct from the other claims of wrongdoing. *Id.* at 848.

But again, the facts here are different. First, Spectrum's policy did not include any "logically or causally related" language. *See id.* at 834. Second, the alleged wrongdoing that the district court determined to be distinct there was not part of the same scheme as the misrepresentations about the value of the license or the cover up of the SEC's investigation into that valuation. In contrast, Under Armour's pull forwards and its misleading statements were part of the same specific scheme to project financial strength in the face of negative economic developments and, as already discussed, the accounting conduct helped facilitate some of the misleading statements.

Still, Under Armour emphasizes that the district court reached another conclusion in *Spectrum*. The district court also pointed out that "naked allegations" that the various claims "represent[ed] mere pieces of a larger 'scheme' to artificially inflate [the insured]'s stock prices" did not sufficiently intertwine the claims such that the policy's exclusions applied. *Id.* at 850–51. That may be true. But allegations that Under Armour's pull forwards facilitated its misleading public statements are not the "bald allegations of conspiracy." *Id.*

25

at 851. The accounting measures the SEC investigated took place at the same time as the public statements. They involve the exact same information as the public statements—the strength of Under Armour's financial condition at a time when questions arose due to the troubles of its major customer, Sports Authority. These are specific allegations about how the accounting misconduct enabled the public misrepresentations. As such, the nature of the allegations demonstrates the logical relationship between Under Armour's Wrongful Acts.

While the decisions Under Armour cites are distinguishable from the case before us, our decision in *W.C. & A.N. Miller Development Co. v. Continental Casualty Co.* is helpful. There, applying Maryland law, we described "interrelated wrongful acts" (defined in the policy as "any wrongful acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event") as an "expansive" term. *W.C. & A.N. Miller Dev. Co.*, 814 F.3d at 176. And to determine logical or causal connectivity, we asked whether "conduct alleged in" separate lawsuits "share[d] a common nexus of fact." *Id.* at 177. Applying that standard, we held that claims in the lawsuit over an alleged breach of a real estate contract by not paying a fee and claims in a separate lawsuit that the insured had taken steps to prevent the entity from collecting on the judgment "share[d] a common nexus of fact." *Id.* at 177. We reasoned that both lawsuits involved the same contract and the same fee. *Id.* We also explained that, but for the breach of contract, neither lawsuit would have taken place. *Id.* Therefore, the lawsuits "share[d] a common nexus: 'an alleged scheme involving the same claimant, the same fee commission, the same contract[] and the same real estate transaction.'" *Id.* (quotation omitted).

26

While there are some differences between that case and this one, *W.C. & A.N. Miller Development* supports the proposition that conduct that is part of the same scheme is logically or causally related. And that is the question we face here. Just as in that case, the alleged accounting misconduct and the alleged public statements were part of the same scheme. That is the type of specific relatedness that the ordinary meaning of logically or causally related requires.

In sum, even looking at only the endorsement's formulation of a single claim, Under Armour's Wrongful Acts fit comfortably within the plain meaning of its requirement that Wrongful Acts be "logically or causally related." And the decisions marshaled by Under Armour in support of a contrary conclusion are distinguishable. Therefore, the 2017–2018 policy's single claims provision precludes the coverage Under Armour seeks.[13]

## B. The 2019–2021 Policy's Specific Investigation Exclusion Does Not Negate the Insurers' Single Claim Argument

Under Armour also argues that six of the nine 2017–2018 insurers later agreed—in connection with an insurance policy issued between 2019 and 2021—that claims stemming from the allegations in the government investigations were made during the 2017–2018 policy period. In advancing this argument, Under Armour points to the specific investigation exclusion in the 2019–2021 policy. This policy—issued by a number of carriers, including six insurers from the 2017–2018 policy—excludes coverage for loss related to the government investigations and provides that claims "excluded pursuant to

---

[13] Because we find the single claims provision applicable, we don't need to address the insurers' arguments about the specific matter and prior notice exclusions.

this Endorsement . . . will be deemed to have been . . . made during the 2017–2018" policy period. J.A. 1467–68. According to the Under Armour, the deeming of claims concerning the government investigations as being made during the 2017–2018 policy conclusively decides the coverage issue as to the six insurers, so the claims arising from the government investigations were made during the 2017–2018 period and are subject to its separate policy limits.

But, as the insurers point out, Under Armour's argument ignores the rest of the 2019–2021 policy language. When the specific investigation exclusion deemed a claim to be made during the 2017–2018 policy year, the exclusion did so "subject to all terms, conditions, limitations and exclusions of the" 2017–2018 policy. J.A. 1468. In effect, this language from the 2019–2021 policy leaves the final determination of coverage under the 2017–2018 policy to that policy's provisions, including the single claim provision. And as we have explained, the single claims provision in the 2017–2018 policy deems these claims first made during the 2016–2017 policy year. So, the 2019–2021 policy's specific investigation exclusion does not change our decision.

### III. CONCLUSION

We recognize that this appeal involves high stakes—$100 million. But these financial implications do not allow us to disregard the plain meaning of the parties' insurance policy. The terms of the policy matter. Applying the plain meaning of the relevant terms to the matters at issue leads to one conclusion—Under Armour is not entitled to additional insurance coverage under its 2017–2018 directors and officers insurance policy. For those reasons, the district court's judgment in favor of Under Armour is,

28

*REVERSED.*